**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

TINAMARIE BARRALES, DAVID FRANKLE, STACY PENNING, MARIA SANTACRUZ, and ELIZA SOLEIMANIAN, individually, on behalf of themselves, the general public, and those similarly situated,

Plaintiffs,

v.

RECKITT BENCKISER LLC and MEAD JOHNSON & COMPANY, LLC,

Defendants.

CASE NO. 5:25-CV-10643-BLF

**FIRST AMENDED CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; AND UNJUST ENRICHMENT**

**JURY TRIAL DEMANDED**

**TABLE OF CONTENTS**


INTRODUCTION ........ 1

THE PARTIES ........ 3

JURISDICTION AND VENUE ........ 5

SUBSTANTIVE ALLEGATIONS ........ 5

A. Defendants Programmed the Websites to Include Third-Party Resources that Utilize Cookie Trackers. ........ 5

B. Defendants Falsely Informed Users That They Could "Disable All" Cookies on the Websites. ........ 11

C. The Private Communications Collected As a Result of Third Party Cookies Transmitted When Visiting Defendants' Websites. ........ 30

1. The Websites Cause the Interception of the Contents of Communications ........ 30

2. Facebook Cookies. ........ 33

3. Google Cookies. ........ 36

4. TikTok Cookies. ........ 43

5. LiveRamp Cookies. ........ 47

6. Salesforce Cookies. ........ 48

7. Trade Desk Cookies. ........ 49

8. Snapchat Cookies. ........ 50

D. The Private Communications Collected are Valuable. ........ 51

PLAINTIFFS' EXPERIENCES ........ 52

CLASS ALLEGATIONS ........ 70

CAUSES OF ACTION ........ 72

First Cause of Action: Invasion of Privacy ........ 72

(asserted by all Plaintiffs against Defendant Reckitt for all Websites and asserted by Plaintiffs Barrales and Soleimanian against Defendant Mead Johnson for the Enfamil Website) ........ 72

Second Cause of Action: Intrusion Upon Seclusion ........ 75

(asserted by all Plaintiffs against Defendant Reckitt for all Websites; and asserted by Barrales and Plaintiff Soleimanian against Defendant Mead Johnson for the Enfamil Website) ........ 75

Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631) ........ 77

(asserted by Plaintiff Penning and Plaintiff Soleimanian against Defendant Reckitt for all Websites; and asserted by Plaintiff Soleimanian against Defendant Mead Johnson for the Enfamil Website) ........ 77

Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) ........ 82

(asserted by Plaintiff Penning and Plaintiff Soleimanian against Defendant Reckitt for all Websites; and asserted by Plaintiff Soleimanian against Defendant Mead Johnson for the Enfamil Website) ... 82

Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation ... 83

(asserted by all Plaintiffs against Defendant Reckitt for all Websites; and asserted by Plaintiffs Barrales and Soleimanian against Defendant Mead Johnson for the Enfamil Website) ... 83

Sixth Cause of Action: Unjust Enrichment ... 86

(asserted by all Plaintiffs against Defendant Reckitt for all Websites and asserted by Plaintiffs Barrales and Soleimanian against Defendant Mead Johnson for the Enfamil Website) ... 86

PRAYER FOR RELIEF ... 87

Plaintiffs Tinamarie Barrales, David Frankle, Stacy Penning, Maria Santacruz, and Eliza Soleimanian ("Plaintiffs") bring this action on behalf of themselves, the general public, and all others similarly situated against Reckitt Benckiser LLC (USA) ("Defendant Reckitt") and Mead Johnson & Company, LLC ("Defendant Mead Johnson") (collectively, "Defendants"). Plaintiffs' allegations against Defendants are based upon information, belief and upon investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based upon Plaintiffs' personal knowledge.

## INTRODUCTION

1. This Class Action Complaint concerns an egregious privacy violation and total breach of consumer trust in violation of California law. When consumers visit and/or visited Defendant's websites—including, durexusa.com ("Durex Website"); k-y.com ("K-Y Website"); enfamil.com ("Enfamil Website"); airwick.us ("Airwick Website"), biofreeze.com ("Biofreeze Website"); finishdishwashing.com ("Finish Website"); lysol.com ("Lysol Website"); mucinex.com ("Mucinex Website"); clearasil.us ("Clearasil Website"); veet.us ("Veet Website"); woolite.us ("Woolite Website"); and schiffvitamins.com ("Schiff Vitamins Website") (each a "Website" and collectively, the "Websites")—Defendants display or displayed to them a popup cookie consent banner, which was substantially the same across all of the Websites. Defendants' cookie banners disclosed that the Websites use cookies but expressly gave users the option to control how they are tracked and how their personal data is used. Defendants assured visitors that they can choose to "Disable All" cookies as shown in the following screenshot of a cookie banner from the Durex Website captured in February 2024:




2. Like most internet websites, Defendants designed the Websites to include resources and programming scripts from third parties that caused those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies

along with user data. Unlike other websites, however, Defendants' Websites offered consumers a choice to browse without being tracked, followed, and targeted by third party data brokers and advertisers. But Defendants' promises, however, were outright lies, designed to lull users into a false sense of security. Even after users elected to "Disable All" cookies, Defendants surreptitiously caused several third parties—including Meta Platforms, Inc. (Facebook), Google LLC (DoubleClick, Google Analytics and YouTube), TikTok USDS Joint Venture LLC (TikTok), LiveRamp Holdings, Inc. (rlcdn.com), Salesforce, Inc. (Evergage), The Trade Desk, Inc. (adsrvr.org), and Snap Inc. (Snapchat)—to place and/or transmit cookies that track users' website browsing activities and eavesdrop on users' private communications on the Websites (the "Third Parties").

3. Contrary to their express disabling of cookies and tracking technologies on the Websites, Defendants nonetheless caused cookies, including the Third Parties' cookies, to be sent to Plaintiffs and other visitors' browsers, stored on their devices, and transmitted to the Third Parties along with user data. These third-party cookies permitted the Third Parties to track and collect data in real time regarding Websites' visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California. The use of the Third Parties' cookies occurred on *each* of the Websites *after* users chose to "Disable All" such cookies, and thus there was a common course of conduct across the Websites in presenting substantially the same cookie banner to visitors, assuring users that they could protect their data, activities, and interests from third parties and advertisers, and then egregiously violating that assurance.

4. The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts,

etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

5. This type of tracking and data sharing is exactly what the Websites' visitors who clicked the "Disable All" button or otherwise disabled cookies through the "Manage Preferences" link on the Websites' cookie consent banners sought to avoid. Defendants falsely told Website users that it respected their privacy and that they could avoid tracking and data sharing when they browsed the Websites. Despite receiving notice of consumers' express declination of consent, Defendants defied it and violated state statutes and tort duties owed to Plaintiffs and those similarly situated users of the Websites.

## THE PARTIES

6. Plaintiff Tinamarie Barrales is, and was at all relevant times, an individual and resident of Huntington Park, California. Plaintiff Barrales intends to remain in California and makes her permanent home there.

7. Plaintiff David Frankle is, and was at all relevant times, an individual and resident of North Hollywood, California. Plaintiff Frankle intends to remain in California and makes his permanent home there.

8. Plaintiff Stacy Penning is, and was at all relevant times, an individual and resident of El Cerrito, California. Plaintiff Penning intends to remain in California and makes his permanent home there.

9. Plaintiff Maria Santacruz is, and was at all relevant times, an individual and resident of Compton, California. Plaintiff Santacruz intends to remain in California and makes her permanent home there.

10. Plaintiff Eliza Soleimanian is, and was at all relevant times, an individual and resident of Beverly Hills, California. Plaintiff Soleimanian intends to remain in California and makes her permanent home there.

11. Defendant Reckitt Benckiser LLC is a Delaware limited liability corporation with its members, headquarters, and principal place of business in Parsippany, New Jersey.

12. Defendant Mead Johnson & Company, LLC is a Delaware limited liability corporation with its principal office address in Evansville, Indiana and Mead Johnson Nutrition Company as its sole member.

13. Defendant Reckitt owns several consumer goods brands which sell a wide range of hygiene, health, and nutrition products. At relevant times, Defendant Reckitt operated and was responsible for the privacy practices for the Websites.

14. On information and belief, Defendant Mead Johnson also operates the Enfamil Website, and is jointly responsible with Defendant Reckitt for the conduct alleged herein with respect to the Enfamil Website. The Terms of Use for the Enfamil Website include the statement that "Mead Johnson Nutrition websites are produced by Mead Johnson & Company." And, at the bottom of the pages on the Enfamil Website, the following text appears:

> NOTICE: We may sell your personal sensitive data.
> Intended for U.S. Residents Only.
> 1998, 2026 Mead Johnson & Company, LLC. All Rights Reserved
> 2400 West Lloyd Expressway, Evansville, IN 47721 USA

However, Reckitt's involvement in the Enfamil Website is apparent on the face of that Website. As shown in paragraph 36, the Enfamil Website uses the same cookie banner as the other Websites operated by Defendant Reckitt. The banner for every Website, including the Enfamil Website, states: "Reckitt uses cookies for personalized advertising and sharing with third parties." Furthermore, the Privacy Policy on the Enfamil Website begins with the following statement: "**Reckitt** values your privacy and the protection of your Personal Data. This Company Privacy Notice ("**Notice**") explains how we collect, store, use, share, transfer, delete, disclose, and process information collected from or about you ("**Personal Data**") by Company and any directly or indirectly controlled affiliate or subsidiary thereof (collectively, "**Company**," "**we**," "**our**," or "**us**")." The Enfamil Privacy Policy also directs users to contact Reckitt with any questions: "If you have questions or comments about this Notice or about how your Personal Data is processed, please contact ConsumerCare_USA@reckitt.com or 1-800-228-4722." The Enfamil Privacy Policy is almost identical to those used on the other Websites and contains no reference to a specific Reckitt entity or to Mead Johnson.

15. Accordingly, because there was a common course of conduct across all of the Websites, Plaintiffs assert their allegations and claims against Defendant Reckitt with respect to all of the Websites, and against Defendant Mead Johnson solely with respect to the Enfamil Website. Plaintiffs allege that Defendants are jointly liable with respect to violations concerning the Enfamil Website, and that Defendant Reckitt is liable for violations concerning all of the Websites.

## JURISDICTION AND VENUE

16. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and Plaintiffs and Defendants are citizens of different states.

17. The injuries, damages, and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendants within, affecting, and emanating from, the State of California. Defendants regularly conduct and/or solicit business in, engage in other persistent courses of conduct in, and/or derive substantial revenue from products and services provided to persons in the State of California. Defendants have engaged, and continue to engage, in substantial and continuous business practices in the State of California.

18. Further, the Private Communications and data which Defendants caused to be transmitted to Third Parties are routed through servers located in California.

19. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

20. Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## SUBSTANTIVE ALLEGATIONS

### A. Defendants Programmed the Websites to Include Third-Party Resources that Utilize Cookie Trackers.

21. Every website, including the Websites, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to and from Internet users' browsers. For example, when a user clicks a hyperlink on one of the

Websites, the user's browser sends a "GET" request to that Website's server. The GET request tells the Website's server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website's server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address so that the Website's server knows where to send the HTTP response.

22. An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4 addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

23. As a result, Defendants knew that the devices used by Plaintiffs and Class members to access the Websites were located in California.

24. Defendants voluntarily integrated "third-party resources" from the Third Parties into the Websites' programming. "Third-party resources" refer to tools, content, or services provided by third-parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendants' use of the third-party resources on the Websites was and is done so pursuant to agreements between Defendants and those Third Parties.

25. The Websites cause users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

26. First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Websites' servers). First-party cookies are used to track users when they repeatedly visit the same website.

27. A third-party cookie is set by a third-party domain/webserver (e.g., www.facebook.com, google-analytics.com, match.adsrvr.org, tr.snapchat.com, etc.). When the user's browser loads a webpage (such as a webpage of the Websites) containing embedded third-party resources, the third-parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows the third-party to recognize and differentiate individual users across websites (including the Websites) and across multiple browsing sessions.

28. As described further below, the Third Parties' cookies stored on and/or loaded from users' devices when they interact with the Websites are transmitted to those third parties, enabling them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendants, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;
- **Visit History**: Information about the frequency and total number of visits to the Website;
- **Website Interactions:** Data on which links, buttons, or ads on the Website that a user clicks;
- **User Input Data**: The information the user entered into the Websites' form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;
- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website content;

- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;
- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;
- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;
- **Referring URL**: Information about the website that referred the user to the Website;
- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;
- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or
- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible, including whether the user is located in California.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

29. Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to boost website performance and revenue through the collection, utilization, and dissemination of user data.

30. The Websites allow users to, among other things, obtain information regarding Defendants' products, browse and search for products, review product ingredients, features, uses, and other product information, access educational and informational content, locate retailers, and, on certain Websites, use interactive tools, create or manage accounts, sign up for offers or other communications, and purchase or obtain information about purchasing products. As users interact with the Websites—including by entering information into forms, searching for products or topics of interest, viewing product and informational content, using interactive tools, clicking links, and making selections—they communicate Private Communications to Defendants, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

31. Defendants chose to install or integrate the Websites with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Websites, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendants incorporate into the Websites, or that Defendants cause to be loaded. Because Defendants control the software code of the Websites, and are capable of determining whether a user is accessing any of the Websites from California, they have complete control over whether first-party and third-party cookies are placed on California users' devices and/or transmitted to third parties.

32. The Websites each share a Privacy Policy[1] that states:

> **Reckitt** values your privacy and the protection of your Personal Data. This Company Privacy Notice ("**Notice**") explains how we collect, store, use, share, transfer, delete, disclose, and process information collected from or about you ("**Personal Data**") by Company and any directly or indirectly controlled affiliate or subsidiary thereof (collectively, "**Company**," "**we**," "**our**," or "**us**").

(Emphasis in original.)

[1] The excerpts quoted appear in Reckitt's common Privacy Policy that appears on all the Websites, which are substantially the same across all of the Websites.

33. Defendants have explained the third-party cookies used on the Websites as follows in the Privacy Policy on the Websites[2]:

> To the extent permitted by applicable law, including in accordance with your consent where required by applicable law, we may engage in the following activities:
>
> . . .
>
> We may display advertisements to you regarding Products and Services that we believe are relevant to you based on your activities on the Online Services or on other web or digital properties. Such advertisements may be shown on our Online Services or the online services of others. We achieve this by using, and allowing third parties (e.g., Facebook, LinkedIn) to use certain cookies, eTags, pixels, web beacons, and other tracking technologies to track your activities on our Online Services and other online services. For more information about these activities and how to manage or opt out of them, please see our Notice on Cookies.
>
> . . .
>
> We also perform statistical analyses of the users of our Online Services to improve the functionality, content, design, and navigation of the Online Services.
>
> On certain of our websites, we use Google Analytics, to help us understand how users engage with this and other of our websites. Google Analytics may track your activity on our sites (i.e., the pages you have seen and the links you have clicked on) and helps us measure how you interact with the content that we provide. This information is used to compile reports and to help us improve the sites. The reports we receive disclose website trends without identifying individual visitors.
>
> . . .
>
> Notice on Cookies
>
> A cookie is a small piece of data (text file) that a website – when visited by a user – asks your browser to store on your device in order to remember information about you, such as your language preference or login information. Those cookies are set by us and called first-party cookies. We also use third-party cookies – which are cookies from a domain different than the domain of the website you are visiting – for our advertising and marketing efforts. We also share and disclose some cookies with third-parties.
>
> More specifically, we use cookies and other tracking technologies for the following purposes:
>
> - Assisting you in navigation;
> - Assisting in registration to our events, login, and your ability to provide feedback;
> - Analyzing your use of our products, services or applications;
> - Assisting with our promotional and marketing efforts. (including behavioral advertising)
>
> …

[2] *Id.*

> Our Website is scanned with our cookie scanning tool regularly to maintain a list as accurate as possible. We classify cookies in the following categories:
> - Strictly Necessary Cookies
> - Performance Cookies
> - Functional Cookies
> - Targeting Cookies

34. Defendants further explained the categories of third-party cookies it used on the Websites as follows in the Privacy Preference Center:

> **Required Cookies**: These cookies are required to enable the core site functions, ensure the website is secure and enable us to manage the network. Without these cookies the site cannot function properly. Examples include cookies used for site navigation, remembering how far you are through a purchase, ensuring that online forms work, enabling you to log in, remembering your consent preferences.
>
> **Performance Cookies**: These cookies allow us to count visits and traffic sources so we can measure and improve the performance of our site. They help us to know which pages are the most and least popular and see how visitors move around the site. All information these cookies collect is aggregated and therefore anonymous. If you do not allow these cookies we will not know when you have visited our site, and will not be able to monitor its performance.
>
> **Advertising Cookies**: These cookies are used for marketing purposes. These cookies enable us to display ads on this site, any other sites that are more relevant to your interests, to find others who look similar in interests, and to measure the effectiveness of our marketing efforts. The use of these cookies may involve tracking, targeting and re-engaging our visitors across multiple sites and social media networks. If you disable these cookies, you will still see advertisements about our products, however they will not be personalized for your interests.
>
> **Functional and Analytics Cookies**:
> These cookies are either functional or analytical. Functional cookies are used to enhance what you can do on our site; examples include providing a better and customized user experience on our site and remembering choices you have made between sessions. Analytics cookies help us understand and measure how you interact with our site, allow us to collect and report statistical information on site traffic, and to test new site content, features or interactions so we can improve the site experience and appearance for all.

## B. Defendants Falsely Informed Users That They Could "Disable All" Cookies on the Websites.

35. When Plaintiffs and other consumers in California visited the Websites, the Websites immediately displayed to them a popup cookie consent banner. As shown in the following screenshot from the Durex Website taken on or about February 2, 2024, which was substantially similar to banners displayed to visitors to the other Websites, the cookie consent banner stated, "Reckitt uses cookies for personalized advertising and sharing with third parties.

If you agree with this use, click **Allow All**. To opt out, click **Disable All**. To allow some cookies and deny others, click **Manage Preferences**." (Emphasis in original.) The banner then purported to provide users the opportunity to click "Manage Preferences," "Disable All," or "Allow All":




36. The following are example screenshots of each Website captured in February 2024:

a. Below is the cookie banner that appeared on the Durex Website:




b. Below is the cookie banner that appeared on the K-Y Website:




c. Below is the cookie banner that appeared on the Enfamil Website:




d. Below is the cookie banner that appeared on the Airwick Website:




e. Below is the cookie banner that appeared on the Biofreeze Website:




f. Below is the cookie banner that appeared on the Finish Website:




g. Below is the cookie banner that appeared on the Lysol Website:




h. Below is the cookie banner that appeared on the Mucinex Website:




i. Below is the cookie banner that appeared on the Clearasil Website:




j. Below is the cookie banner that appeared on the Veet Website:




k. Below is the cookie banner that appeared on the Woolite Website:




l. Below is the cookie banner that appeared on the Schiff Vitamins Website:




37. Plaintiffs and other Website users who clicked the "Disable All" button, indicating their choice and/or agreement to decline or opt out of all cookies and tracking technologies "and sharing with third parties" in use on the Websites, could then continue to browse the Websites, and the popup cookie consent banner disappeared. Website users could also disable such cookies through the "Manage Preferences" link, similarly indicating their choice and/or agreement to decline or opt out of all cookies and tracking technologies, including those that enable "sharing with third parties," in use on the Websites.

38. Defendants' popup cookie consent banner led Plaintiffs, and all those Website users similarly situated, to believe that they disabled all cookies and tracking technologies, especially those that used "for personalized advertising and sharing with third parties." The banner further reasonably led Plaintiffs and those Website users similarly situated to believe that Defendants would not allow third parties, through cookies, to access their Private Communications with the Websites, including their browsing history, visit history, website

interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking or selecting "Disable All" cookies.

39. Defendants' representations, however, were false. In truth, Defendants did not abide by Plaintiffs' or other users' wishes. When Plaintiffs and other Website users clicked "Disable All" cookies, or disabled such cookies through clicking the "Manage Preferences" link on the Websites, they provided notice to Defendants that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Websites. Nevertheless, Defendants caused the Third Party tracking cookies to be placed on Websites users' browsers and devices and/or transmitted to the Third Parties along with user data.

40. In particular, when users clicked "Disable All" cookies in the consent banner, or disabled such cookies through the "Manage Preferences" link, Defendants nonetheless continued to cause the Third Parties' cookies to be placed on users' devices and/or transmitted to the Third Parties along with user data, enabling them to collect user data in real time that discloses Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by disabling cookies, Defendants failed to prevent cookies from being transmitted to Third Parties, enabling them to track user behavior and communications.

41. Some aspects of the operations of the Third Parties' cookies on the Websites can be observed using specialized tools that log incoming and outgoing network transmissions on the Websites. The following screenshots, obtained on or around March 24, 2024 using one such tool, show examples of Third-Party cookies being transmitted from a Website user's device and browser to Third Parties even after the user clicked "Disable All" cookies, or disabled such cookies through the "Manage Preferences" link, on the Durex Website, K-Y Website, Enfamil

Website, Airwick Website and Biofreeze Website Websites' popup cookie consent banners. The other Websites transmitted cookies to the Third Parties in a similar manner at that time.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**<u>Durex Website</u>**




| Name | Method | Status | Domain | Cookies |
|---|---|---|---|---|
| trigger/?id=151584395529152&ev=Subsc... | GET | 200 | www.facebook.com | 7 |
| tr/?id=151584395529152&ev=Subscribed... | GET | 200 | www.facebook.com | 7 |
| trigger/?id=734177503632778&ev=Subs... | GET | 200 | www.facebook.com | 7 |
| tr/?id=734177503632778&ev=Subscribe... | GET | 200 | www.facebook.com | 7 |
| trigger/?id=1057460314446948&ev=Sub... | GET | 200 | www.facebook.com | 7 |
| tr/?id=1057460314446948&ev=Subscrib... | GET | 200 | www.facebook.com | 7 |
| generic?ttd_pid=r8sernb&ttd_tpi=1&ttd_... | GET | 302 | match.adsrvr.org | 3 |
| generic?ttd_pid=r8sernb&ttd_tpi=1&ttd_... | GET | 302 | match.adsrvr.org | 3 |
| generic?ttd_pid=r8sernb&ttd_tpi=1&ttd_... | GET | 302 | match.adsrvr.org | 3 |
| generic?ttd_pid=r8sernb&ttd_tpi=1&ttd_... | GET | 302 | match.adsrvr.org | 3 |
| generic?ttd_pid=r8sernb&ttd_tpi=1&ttd_... | GET | 302 | match.adsrvr.org | 3 |
| generic?ttd_pid=r8sernb&ttd_tpi=1&ttd_... | GET | 302 | match.adsrvr.org | 3 |
| generic?ttd_pid=r8sernb&ttd_tpi=1&ttd_... | GET | 302 | match.adsrvr.org | 3 |
| generic?ttd_pid=r8sernb&ttd_tpi=1&ttd_... | GET | 302 | match.adsrvr.org | 3 |
| generic?ttd_pid=r8sernb&ttd_tpi=1&ttd_... | GET | 302 | match.adsrvr.org | 3 |
| generic?ttd_pid=r8sernb&ttd_tpi=1&ttd_... | GET | 302 | match.adsrvr.org | 3 |
| generic?ttd_pid=r8sernb&ttd_tpi=1&ttd_... | GET | 302 | match.adsrvr.org | 3 |
| 711236.html?pdata=session_id%3D17113... | GET | 200 | di.rlcdn.com | 2 |
| 711236.html?pdata=session_id%3D17113... | GET | 200 | di.rlcdn.com | 2 |
| 711236.html?pdata=session_id%3D17113... | GET | 200 | di.rlcdn.com | 2 |
| 711236.html?pdata=session_id%3D17113... | GET | 200 | di.rlcdn.com | 2 |
| 711236.html?pdata=session_id%3D17113... | GET | 200 | di.rlcdn.com | 2 |
| sid_fp.html;CIS3SID=7075CF59FD8A499... | GET | 200 | h.online-metrix.net | 1 |
| ls_fp.html;CIS3SID=E709A8B61881E9AD... | GET | 200 | imgs.signifyd.com | 1 |
| ls_fp.html;CIS3SID=5E6EC2FB12835F04... | GET | 200 | imgs.signifyd.com | 1 |
| sid_fp.html;CIS3SID=5E6EC2FB12835F0... | GET | 200 | h.online-metrix.net | 1 |
| top_fp.html;CIS3SID=DD840288CC21DB... | GET | 200 | imgs.signifyd.com | 1 |
| top_fp.html;CIS3SID=EC5AE974E626C2... | GET | 200 | imgs.signifyd.com | 1 |
| sid_fp.html;CIS3SID=EC5AE974E626C2C... | GET | 200 | h.online-metrix.net | 1 |
| ls_fp.html;CIS3SID=7FDD3BA6524F334F... | GET | 200 | imgs.signifyd.com | 1 |
| ls_fp.html;CIS3SID=01459F2343799F73... | GET | 200 | imgs.signifyd.com | 1 |
| ls_fp.html;CIS3SID=9535852463D61F0B... | GET | 200 | imgs.signifyd.com | 1 |
| sid_fp.html;CIS3SID=7FDD3BA6524F334... | GET | 200 | h.online-metrix.net | 1 |
| sid_fp.html;CIS3SID=9535852463D61F0... | GET | 200 | h.online-metrix.net | 1 |
| top_fp.html;CIS3SID=7FDD3BA6524F33... | GET | 200 | imgs.signifyd.com | 1 |
| ls_fp.html;CIS3SID=732F18F732581B610... | GET | 200 | imgs.signifyd.com | 1 |




| Name | Method | Status | Domain | Cookies |
|---|---|---|---|---|
| sid_fp.html;CIS3SID=DD840288CC21DB... | GET | 200 | h.online-metrix.net | 1 |
| ls_fp.html;CIS3SID=7075CF59FD8A4994... | GET | 200 | imgs.signifyd.com | 1 |
| sid_fp.html;CIS3SID=C3FE87F195DBA99... | GET | 200 | h.online-metrix.net | 1 |
| sid_fp.html;CIS3SID=9F32301E95EA472... | GET | 200 | h.online-metrix.net | 1 |
| sid_fp.html;CIS3SID=732F18F732581B61... | GET | 200 | h.online-metrix.net | 1 |
| ls_fp.html;CIS3SID=C3FE87F195DBA99F... | GET | 200 | imgs.signifyd.com | 1 |
| top_fp.html;CIS3SID=732F18F732581B61... | GET | 200 | imgs.signifyd.com | 1 |
| top_fp.html;CIS3SID=01459F2343799F7... | GET | 200 | imgs.signifyd.com | 1 |
| ls_fp.html;CIS3SID=EC5AE974E626C2CE... | GET | 200 | imgs.signifyd.com | 1 |
| ls_fp.html;CIS3SID=9F32301E95EA472F... | GET | 200 | imgs.signifyd.com | 1 |
| top_fp.html;CIS3SID=E709A8B61881E9A... | GET | 200 | imgs.signifyd.com | 1 |
| top_fp.html;CIS3SID=5E6EC2FB12835F0... | GET | 200 | imgs.signifyd.com | 1 |
| sid_fp.html;CIS3SID=01459F2343799F7... | GET | 200 | h.online-metrix.net | 1 |
| top_fp.html;CIS3SID=C3FE87F195DBA99... | GET | 200 | imgs.signifyd.com | 1 |
| top_fp.html;CIS3SID=7075CF59FD8A499... | GET | 200 | imgs.signifyd.com | 1 |
| clear1.png;CIS3SID=BFEA951628C66E88... | GET | 204 | h.online-metrix.net | 1 |
| clear1.png;CIS3SID=F1516F0D396E908B... | GET | 204 | h.online-metrix.net | 1 |
| clear1.png;CIS3SID=D90ED97990EB358... | GET | 204 | h.online-metrix.net | 1 |
| clear1.png;CIS3SID=051F74D3DAFF466D... | GET | 204 | h.online-metrix.net | 1 |
| clear1.png;CIS3SID=12995E916B9D20E0... | GET | 204 | h.online-metrix.net | 1 |
| clear1.png;CIS3SID=CD6294D80C53DE1... | GET | 204 | h.online-metrix.net | 1 |
| clear1.png;CIS3SID=1307DE887EAE81E2... | GET | 204 | h.online-metrix.net | 1 |
| clear1.png;CIS3SID=868E5D4D00BD1A3... | GET | 204 | h.online-metrix.net | 1 |
| clear1.png;CIS3SID=053505A71B2EB1DE... | GET | 204 | h.online-metrix.net | 1 |
| clear1.png;CIS3SID=1006C5993D02485... | GET | 204 | h.online-metrix.net | 1 |
| clear1.png;CIS3SID=608EF29078F6A251... | GET | 204 | h.online-metrix.net | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | POST | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | POST | (unknown) | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | POST | (unknown) | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | POST | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | POST | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |




| Name | Method | Status | Domain | Cookies |
|---|---|---|---|---|
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | POST | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | POST | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | POST | (unknown) | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | POST | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | POST | 204 | imgs.signifyd.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| clear3.png;CIS3SID=DD840288CC21DBA... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| clear1.png;CIS3SID=DD840288CC21DBA... | GET | 204 | imgs.signifyd.com | 1 |
| clear3.png;CIS3SID=DD840288CC21DBA... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 200 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 200 | imgs.signifyd.com | 1 |
| check.js;CIS3SID=DD840288CC21DBAD... | GET | 200 | imgs.signifyd.com | 1 |
| p | POST | 200 | tr6.snapchat.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| tags.js?org_id=w2txo5aa&session_id=21... | GET | 200 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| clear1.png;CIS3SID=7FDD3BA6524F334... | GET | 204 | imgs.signifyd.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| clear3.png;CIS3SID=7FDD3BA6524F334... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 200 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 200 | imgs.signifyd.com | imgs.signifyd.com |
| check.js;CIS3SID=7FDD3BA6524F334FB... | GET | 200 | imgs.signifyd.com | 1 |
| p | POST | 200 | tr6.snapchat.com | 1 |




| Name | Method | Status | Domain | Cookies |
|---|---|---|---|---|
| tags.js?org_id=w2txo5aa&session_id=21... | GET | 200 | imgs.signifyd.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| clear3.png;CIS3SID=5E6EC2FB12835F04... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| clear1.png;CIS3SID=5E6EC2FB12835F04... | GET | 204 | imgs.signifyd.com | 1 |
| clear3.png;CIS3SID=5E6EC2FB12835F04... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 200 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 200 | imgs.signifyd.com | 1 |
| check.js;CIS3SID=5E6EC2FB12835F04B... | GET | 200 | imgs.signifyd.com | 1 |
| p | POST | 200 | tr6.snapchat.com | 1 |
| tags.js?org_id=w2txo5aa&session_id=21... | GET | 200 | imgs.signifyd.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| clear3.png;CIS3SID=01459F2343799F73... | GET | 204 | imgs.signifyd.com | 1 |
| p | POST | 200 | tr6.snapchat.com | 1 |
| clear3.png;CIS3SID=01459F2343799F73... | GET | 204 | imgs.signifyd.com | 1 |
| clear3.png;CIS3SID=01459F2343799F73... | GET | 204 | imgs.signifyd.com | 1 |
| clear3.png;CIS3SID=01459F2343799F73... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| clear1.png;CIS3SID=01459F2343799F73... | GET | 204 | imgs.signifyd.com | 1 |
| clear3.png;CIS3SID=01459F2343799F73... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 200 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 200 | imgs.signifyd.com | 1 |
| check.js;CIS3SID=01459F2343799F7351... | GET | 200 | imgs.signifyd.com | 1 |
| tags.js?org_id=w2txo5aa&session_id=21... | GET | 200 | imgs.signifyd.com | 1 |




| Name | Method | Status | Domain | Cookies |
|---|---|---|---|---|
| p | POST | 200 | tr.snapchat.com | 1 |
| clear3.png;CIS3SID=732F18F732581B61... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| clear1.png;CIS3SID=732F18F732581B610... | GET | 204 | imgs.signifyd.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| clear3.png;CIS3SID=732F18F732581B61... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 200 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 200 | imgs.signifyd.com | 1 |
| check.js;CIS3SID=732F18F732581B610F... | GET | 200 | imgs.signifyd.com | 1 |
| p | POST | 200 | tr6.snapchat.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| tags.js?org_id=w2txo5aa&session_id=21... | GET | 200 | imgs.signifyd.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| clear3.png;CIS3SID=EC5AE974E626C2C... | GET | 204 | imgs.signifyd.com | 1 |
| clear3.png;CIS3SID=EC5AE974E626C2C... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| clear1.png;CIS3SID=EC5AE974E626C2C... | GET | 204 | imgs.signifyd.com | 1 |
| clear3.png;CIS3SID=EC5AE974E626C2C... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| p | POST | 200 | tr6.snapchat.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 200 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 200 | imgs.signifyd.com | 1 |
| check.js;CIS3SID=EC5AE974E626C2CE5... | GET | 200 | imgs.signifyd.com | 1 |
| tags.js?org_id=w2txo5aa&session_id=21... | GET | 200 | imgs.signifyd.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| clear3.png;CIS3SID=9F32301E95EA472F... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| clear1.png;CIS3SID=9F32301E95EA472F... | GET | 204 | imgs.signifyd.com | 1 |




| Name | Method | Status | Domain | Cookies |
|---|---|---|---|---|
| clear3.png;CIS3SID=9F32301E95EA472F... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| clear1.png;CIS3SID=9F32301E95EA472F... | GET | 204 | imgs.signifyd.com | 1 |
| clear3.png;CIS3SID=9F32301E95EA472F... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 200 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 200 | imgs.signifyd.com | 1 |
| check.js;CIS3SID=9F32301E95EA472FD7... | GET | 200 | imgs.signifyd.com | 1 |
| tags.js?org_id=w2txo5aa&session_id=21... | GET | 200 | imgs.signifyd.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| p | POST | 200 | tr6.snapchat.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| clear3.png;CIS3SID=E709A8B61881E9AD... | GET | 204 | imgs.signifyd.com | 1 |
| clear3.png;CIS3SID=E709A8B61881E9AD... | GET | 204 | imgs.signifyd.com | 1 |
| clear3.png;CIS3SID=E709A8B61881E9AD... | GET | 204 | imgs.signifyd.com | 1 |
| clear3.png;CIS3SID=E709A8B61881E9AD... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| clear1.png;CIS3SID=E709A8B61881E9AD... | GET | 204 | imgs.signifyd.com | 1 |
| clear3.png;CIS3SID=E709A8B61881E9AD... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| p | POST | 200 | tr6.snapchat.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 200 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 200 | imgs.signifyd.com | 1 |
| check.js;CIS3SID=E709A8B61881E9AD8... | GET | 200 | imgs.signifyd.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| tags.js?org_id=w2txo5aa&session_id=21... | GET | 200 | imgs.signifyd.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| clear3.png;CIS3SID=9535852463D61F0... | GET | 204 | imgs.signifyd.com | 1 |
| clear.png?org_id=w2txo5aa&session_id=... | GET | 204 | imgs.signifyd.com | 1 |
| clear1.png;CIS3SID=9535852463D61F0B... | GET | 204 | imgs.signifyd.com | 1 |




**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**Enfamil Website**

ıfamil-neuropro-infant-formula/liquid-32-fl-oz-32-fl-oz-bottle/

Elements Console Sources Network Performance Memory Application Security Ligh

Preserve log  Disable cache  No throttling

Filter  Invert  Hide data URLs  Hide extension URLs  All  Fetch/XHR  Doc  CSS  JS

3rd-party requests

Big request rows

Overview

| Name | Method | Status | Domain | Cookies ▼ |
|---|---|---|---|---|
| trigger/?id=480447622348321&ev=ViewC... | GET | 200 | www.facebook.com | 7 |
| tr/?id=480447622348321&ev=ViewConten... | GET | 200 | www.facebook.com | 7 |
| trigger/?id=480447622348321&ev=PageVi... | GET | 200 | www.facebook.com | 7 |
| tr/?id=480447622348321&ev=PageView&... | GET | 200 | www.facebook.com | 7 |
| trigger/?id=480447622348321&ev=view_c... | GET | 200 | www.facebook.com | 7 |
| tr/?id=480447622348321&ev=view_categ... | GET | 200 | www.facebook.com | 7 |
| trigger/?id=480447622348321&ev=PageVi... | GET | 200 | www.facebook.com | 7 |
| tr/?id=480447622348321&ev=PageView&... | GET | 200 | www.facebook.com | 7 |
| trigger/?id=480447622348321&ev=Subsc... | GET | 200 | www.facebook.com | 7 |
| tr/?id=480447622348321&ev=Subscribed... | GET | 200 | www.facebook.com | 7 |
| trigger/?id=480447622348321&ev=Subsc... | GET | 200 | www.facebook.com | 7 |
| tr/?id=480447622348321&ev=Subscribed... | GET | 200 | www.facebook.com | 7 |
| trigger/?id=480447622348321&ev=PageVi... | GET | 200 | www.facebook.com | 7 |
| tr/?id=480447622348321&ev=PageView&... | GET | 200 | www.facebook.com | 7 |
| trigger/?id=480447622348321&ev=Subsc... | GET | 200 | www.facebook.com | 7 |
| tr/?id=480447622348321&ev=Subscribed... | GET | 200 | www.facebook.com | 7 |
| anchor?ar=1&k=6LfGm8QeAAAAJzNO9t... | GET | 200 | www.google.com | 6 |
| p | POST | 200 | tr6.snapchat.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| act | POST | 200 | analytics.tiktok.com | 1 |
| collect?v=2&tid=G-KNWCGV5LQV&gtm=4... | POST | 302 | www.google-analytics.com | 1 |
| register-conversion?_c=1&cid=228723025... | GET | 204 | www.google-analytics.com | 1 |
| collect?v=2&tid=G-KNWCGV5LQV&gtm=4... | POST | 204 | www.google-analytics.com | 1 |
| collect?v=2&tid=G-KNWCGV5LQV&gtm=4... | POST | 302 | www.google-analytics.com | 1 |
| register-conversion?_c=1&cid=228723025... | GET | 204 | www.google-analytics.com | 1 |
| er?.bv=16&_ak=reckittbenckiser&_ds=eng... | POST | 204 | reckittbenckiser.us-1.evergage.com | 1 |
| er?.bv=16&_ak=reckittbenckiser&_ds=eng... | POST | 204 | reckittbenckiser.us-1.evergage.com | 1 |
| er?.bv=16&_ak=reckittbenckiser&_ds=eng... | POST | 204 | reckittbenckiser.us-1.evergage.com | 1 |
| er?.bv=16&_ak=reckittbenckiser&_ds=eng... | POST | 204 | reckittbenckiser.us-1.evergage.com | 1 |
| pr?.top=5786&action=Home&.bv=16&_ak... | POST | 204 | reckittbenckiser.us-1.evergage.com | 1 |
| collect?v=2&tid=G-KNWCGV5LQV&gtm=4... | POST | 204 | www.google-analytics.com | 1 |
| collect?v=2&tid=G-KNWCGV5LQV&gtm=4... | POST | 302 | www.google-analytics.com | 1 |
| register-conversion?_c=1&cid=228723025... | GET | 204 | www.google-analytics.com | 1 |
| collect?v=2&tid=G-KNWCGV5LQV&gtm=4... | POST | 204 | www.google-analytics.com | 1 |
| act | POST | 200 | analytics.tiktok.com | 1 |


famil-neuropro-infant-formula/liquid-32-fl-oz-32-fl-oz-bottle/

Elements Console Sources Network Performance Memory Application Security Lig

Preserve log | Disable cache | No throttling

Filter | Invert | Hide data URLs | Hide extension URLs | All | Fetch/XHR | Doc | CSS | J

3rd-party requests

Big request rows

Overview

| Name | Method | Status | Domain | Cookies |
|---|---|---|---|---|
| collect?v=1&_v=j101&aip=1&a=104299432... | GET | 200 | www.google-analytics.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| collect?v=2&tid=G-KNWCGV5LQV&gtm=4... | POST | 204 | www.google-analytics.com | 1 |
| pr?.top=33120&action=Home&.bv=16&_ak... | POST | 204 | reckittbenckiser.us-1.evergage.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| msreceiver?.cStat=%5B%7B%22type%22... | POST | 204 | reckittbenckiser.us-1.evergage.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| act | POST | 200 | analytics.tiktok.com | 1 |
| collect?v=2&tid=G-KNWCGV5LQV&gtm=4... | POST | 204 | www.google-analytics.com | 1 |
| engage | POST | 400 | reckittbenckiser.us-1.evergage.com | 1 |
| pr?.top=5939&item=%7B%22type%22%3... | POST | 204 | reckittbenckiser.us-1.evergage.com | 1 |
| act | POST | 200 | analytics.tiktok.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| collect?v=2&tid=G-KNWCGV5LQV&gtm=4... | POST | 302 | www.google-analytics.com | 1 |
| register-conversion?_c=1&cid=228723025... | GET | 204 | www.google-analytics.com | 1 |
| collect?v=2&tid=G-KNWCGV5LQV&gtm=4... | POST | 204 | www.google-analytics.com | 1 |
| p | POST | 200 | tr.snapchat.com | 1 |
| act | POST | 200 | analytics.tiktok.com | 1 |
| collect?v=2&tid=G-KNWCGV5LQV&gtm=4... | POST | 204 | www.google-analytics.com | 1 |
| engage | POST | 400 | reckittbenckiser.us-1.evergage.com | 1 |
| pr?.top=3014&item=%7B%22type%22%3... | POST | 204 | reckittbenckiser.us-1.evergage.com | 1 |
| act | POST | 200 | analytics.tiktok.com | 1 |
| pr?.top=2086&item=%7B%22type%22%3... | POST | 204 | reckittbenckiser.us-1.evergage.com | 1 |

**K-Y Website**


Elements
Console
Sources
Network
Performance
Memory
Application
Security
Lighthouse
Recorder
Performance insights
ResourcesSaver
Preserve log
Disable cache
No throttling
Filter
Invert
Hide data URLs
Hide extension URLs
All
Fetch/XHR
Doc
CSS
JS
Font
Img
Media
Manifest
WS
Wasm
Other
Blocked response
3rd-party requests
Big request rows
Group by frame
Overview
Screenshots
Name
Status
Domain
Cookies
act
200
analytics.tiktok.com
www.google-analytics.com
www.storygize.net
collect
204
l.clarity.ms
consentreceipts
privacyportal-eu.onetrust.com
ot_persistent_cookie.png
cdn.cookielaw.org
29 / 31 requests
16.4 kB / 55.5 kB transferred
8.2 kB / 44.0 kB resources



Elements Console Sources Network Performance Memory Application Security Lighthouse Recorder Performance insights ResourcesSaver
Preserve log Disable cache No throttling
Filter Invert Hide data URLs Hide extension URLs All Fetch/XHR Doc CSS JS Font Img Media Manifest WS Wasm Other Blocked response
3rd-party requests
Big request rows
Group by frame
Overview
Screenshots
Name Status Domain Cookies
act 200 analytics.tiktok.com 4
activity;register_conversion=1;src=10978400;type=e...;uaw=0;epver=2;~oref=https%3A%2F%2... 200 ad.doubleclick.net 3
activity;register_conversion=1;src=10978400;type=e...;uaw=0;epver=2;~oref=https%3A%2F%2... 200 ad.doubleclick.net 3
activity;register_conversion=1;src=9040637;type=co...;uaw=0;epver=2;~oref=https%3A%2F%2... 200 ad.doubleclick.net 3
activity;register_conversion=1;src=9040637;type=la...;uaw=0;epver=2;~oref=https%3A%2F%2F... 200 ad.doubleclick.net 3
img?mt_id=1398691&mt_adid=215356&mt_exem=&mt_excl=...%20width=%271%27%20heig... 200 pixel.mathtag.com 3
activity;register_conversion=1;src=10978400;type=e...f=https%3A%2F%2Fwww.k-y.com%2Fcol... 200 ad.doubleclick.net 3
activity;register_conversion=1;src=10978400;type=p...f=https%3A%2F%2Fwww.k-y.com%2Fcol... 200 ad.doubleclick.net 3
activity;register_conversion=1;src=9040637;type=ky...f=https%3A%2F%2Fwww.k-y.com%2Fcoll... 200 ad.doubleclick.net 3
activity;register_conversion=1;src=9040637;type=co...f=https%3A%2F%2Fwww.k-y.com%2Fcol... 200 ad.doubleclick.net 3
img?mt_id=1398691&mt_adid=215356&mt_exem=&mt_excl=...20width=%271%27%20height... 200 pixel.mathtag.com 3
0?ti=259001069&tm=gtm002&Ver=2&mid=3ef89ecc-a2f6-4...1ee9fe575a9f8d0ab46&vids=0... 204 bat.bing.com 3
activity;register_conversion=1;src=10978400;type=e...k-y.com%2Fapps%2Fomega-search%2F... 200 ad.doubleclick.net 3
activity;register_conversion=1;src=9040637;type=co...k-y.com%2Fapps%2Fomega-search%2F... 200 ad.doubleclick.net 3
img?mt_id=1398691&mt_adid=215356&mt_exem=&mt_excl=...20width=%271%27%20height... 200 pixel.mathtag.com 3
activity;register_conversion=1;src=10978400;type=e...2;~oref=https%3A%2F%2Fwww.k-y.com... 200 ad.doubleclick.net 3
activity;register_conversion=1;src=10978400;type=e...2;~oref=https%3A%2F%2Fwww.k-y.com... 200 ad.doubleclick.net 3
activity;register_conversion=1;src=9040637;type=ky...2;~oref=https%3A%2F%2Fwww.k-y.com... 200 ad.doubleclick.net 3
activity;register_conversion=1;src=9040637;type=co...2;~oref=https%3A%2F%2Fwww.k-y.com... 200 ad.doubleclick.net 3
img?mt_id=1398691&mt_adid=215356&mt_exem=&mt_excl=...%20width=%271%27%20heig... 200 pixel.mathtag.com 3
generic?ttd_pid=r8semb&ttd_tpi=1&ttd_puid=9ff1bf40-ad3f-4f15-b367-b169f46636c5 302 match.adsrvr.org 2
generic?ttd_pid=r8semb&ttd_tpi=1&ttd_puid=257aa8fc-83dc-43dd-95de-4de5ab0ed1db 302 match.adsrvr.org 2
generic?ttd_pid=r8semb&ttd_tpi=1&ttd_puid=b3bb8c20-eec1-4f18-9d15-fd268fe5cedb 302 match.adsrvr.org 2
generic?ttd_pid=r8semb&ttd_tpi=1&ttd_puid=fb79ace7-23f9-435c-9205-b8043df2923b 302 match.adsrvr.org 2
top_fp.html;CIS3SID=A4718E18539ED5ED986C8504974597...851690122kyusamyshopifycom&... 200 imgs.signifyd.com 1
ls_fp.html;CIS3SID=E4726E90E49961F6DFB3DE84D0D5441...851690122kyusamyshopifycom&n... 200 imgs.signifyd.com 1
top_fp.html;CIS3SID=A02F428C24E8C23E438FE3BAAEFA14...851690122kyusamyshopifycom&n... 200 imgs.signifyd.com 1
top_fp.html;CIS3SID=703C2DD392F214DD88ED7B60DD6543...851690122kyusamyshopifycom... 200 imgs.signifyd.com 1
ls_fp.html;CIS3SID=A4718E18539ED5ED986C85049745973...851690122kyusamyshopifycom&n... 200 imgs.signifyd.com 1
ls_fp.html;CIS3SID=703C2DD392F214DD88ED7B60DD65432...851690122kyusamyshopifycom... 200 imgs.signifyd.com 1
ls_fp.html;CIS3SID=A02F428C24E8C23E438FE3BAAEFA146...851690122kyusamyshopifycom&n... 200 imgs.signifyd.com 1
383 / 636 requests | 1.7 MB / 2.4 MB transferred | 18.2 MB / 22.9 MB resources | Finish: 3.73 s | DOMContentLoaded: 1.55 s | Load: 2.45 s

**Airwick Website**



**Biofreeze Website**




42. The screenshots above show the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third party websites while the user visited and interacted with Defendant's Websites at durexusa.com, enfamil.com, k-y.com, airwick.us, and biofreeze.com, respectively. The

screenshots depict only network traffic that occurred ***after*** the user disabled all cookies using the "Disable All" button in the cookie banner. As shown above, despite the user's choice to disable all cookies, the user's interactions with the Websites resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains like www.facebook.com, google-analytics.com, match.adsrvr.org, tr.snapchat.com, and others. As further shown in the right-hand column of the screenshots, the user's browser sent cookies along with those HTTP requests to the third parties. These screenshots demonstrate that the Websites caused third-party cookie data and users' Private Communications to be intercepted by the Third Parties, even after consumers disabled all cookies and tracking technologies by clicking the "Disable All" cookies button or disabling such cookies through the "Manage Preferences" link. All of these network calls were made to the Third Parties without the user's knowledge, and despite the user electing to disable all such cookies.

43. Plaintiffs' and other Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

44. As users interacted with the Websites—even after clicking the "Disable All" cookies button, or disabling such cookies through the "Manage Preferences" link, thereby declining or disabling the use of cookies and similar technologies for personalized content, advertising, and analytics, as well as the sale or sharing of the user's personal information with third parties for such functions, or other purposes—more data regarding users' behavior and communications were intercepted by third parties, alongside the cookie data. The third-party cookies that Defendants wrongfully allowed to be stored on users' devices and browsers, and to be transmitted to the Third Parties, caused the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Websites. Because third-party cookies cause Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive

user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

45. The Third Party code that the Websites caused to be loaded and executed by the user's browser became a wiretap when executed because it caused the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties used their respective wiretaps on Website users' Private Communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

## C. The Private Communications Collected As a Result of Third Party Cookies Transmitted When Visiting Defendants' Websites.

### 1. The Websites Cause the Interception of the Contents of Communications.

46. The Websites all include search bars and forms where users input information. For example, below is a screenshot of the search bar on the Lysol Website where users can type into the search bar to cause the Website to search its contents.




47. All of the Websites include or included a similar search bar that allows or allowed users to input a search query and search the Website for topics or products of interest to them.

48. When users input the information into the search bar, they are intending to communicate with the Website the contents of the search to receive the information they are interested in.

49. Instead, the software on the Website caused the contents of the communication to be intercepted while in transit.

50. For example, the Durex Website sent consumers' search strings to Snapchat—even after consumers disabled all cookies. In the example below, the test string "purple-condom-test-string" was intercepted by Snapchat along with cookie data, the URL of the page the user was viewing, and the user's detailed device and browser information:






51. Similarly, the Enfamil Website sent the test query "is-my-baby-healthy-test-string" to Google Analytics, along with cookie and other data:




52. The Websites also offer a feature that allows a user to search for where a product is sold. Below is an example of the search results of inputting "San Francisco, California" into the "Find Nearby" search bar on the Lysol Website:




53. All of the Websites offer a feature that allows users to search for where products are sold by allowing users to input data into the location search bar. On information and belief, the Websites also caused information input by users on the location search that is intended to be sent to the Website to be intercepted in a similar fashion as search queries, as described above.

**2. Facebook Cookies.**

54. Defendants caused third party cookies to be transmitted to and from the browsers and devices of users of the Websites to and from the **facebook.com** domain, even after users elected to disable all cookies (including "Advertising" cookies).[3] This domain is associated with Meta's digital advertising and analytics platform that collects user information via cookies to assist Meta in performing data collection, behavioral analysis, user retargeting, and analytics.[4] Meta serves targeted ads to web users across Meta's ad network, which spans millions of websites and apps.

55. Facebook cookies help Meta track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. For example, the Durex Website

[3] In the Privacy Preference Center, Defendant disclosed facebook.com cookies as "Advertising" cookies in use on the Website that could be disabled.
[4] https://www.facebook.com/privacy/policies/cookies/.

caused event data to be sent to Facebook when users navigated the Website and performed actions such as clicking a button on the Website. As part of that data, Defendant Reckitt caused the page title to be sent to Facebook:

| | |
|---|---|
| cd[pageFeatures] | %7B"title"%3A"%5Cn%20%20%20%20%20%20The%20World%27s%20%231%20Trusted%20Condom%20Brand%20%7C%20Durex%C2%AE%20USA%5Cn%20%E2%80%93%20Durex%20USA"%7D |

56. Similarly, the Enfamil Website caused "ViewContent" events to be sent to Facebook when users viewed content on that Website. In the following example, the user viewed an Enfamil infant formula powder 7-oz product:

| | |
|---|---|
| ev | ViewContent |
| dl | https%3A%2F%2Fwww.enfamil.com%2Fproducts%2Fenfamil-neuropro-infant-formula%2Fpowder-tub-20-7-oz-tub%2F |

57. Along with the Facebook event data, the Websites caused cookie data to be sent to Facebook. The following screenshot shows cookie data that the Durex Website caused to be sent to Facebook:

Request Header Query Body Cookies Raw | Summary +

| Key | Value |
|---|---|
| c_user | 1345507951 |
| datr | RyogZtjuDZEAdVpnopJWXCFm |
| fr | 1K3QfTqJrr5dHILST.AWXscl8oGVKOHWaJAEh4n6pbvPM.BmJEkS..AAA.0.0.BmJEkb.AWWGhzjkWI4 |
| locale | en_US |
| ps_n | 1 |
| sb | RyogZi9RO37nzO1o181pp9aX |
| xs | 50%3AMexySonwaUzLfg%3A2%3A1713384034%3A-1%3A2633%3A%3AAcUe014sCm0S1QF1bACqJwWF6ioBjxl7j2IbPupc3g |

58. Similarly, the following screenshot shows cookie data that the Enfamil Website caused to be sent to Facebook:

Request Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| c_user | 1345507951 |
| datr | FsT8Zf1RzKc9J_QW2sezxIGM |
| fr | 1i609O136SvV207N0.AWVY1xt-IbUx8LZsI-3VgePZyAc.BI_1Ja..AAA.0.0.BI_1Ja.AWVCfET1IXs |
| locale | en_US |
| ps_n | 0 |
| sb | FsT8ZfN5LvSnuDaNI8RhtnOd |
| xs | 41%3Atd5e-MLmwVuOgg%3A2%3A1711064122%3A-1%3A2633%3A%3AAcWhZCo6gSmAwyXmyyPVJDF8ddxrQxYRRFeflg0JdA |

59. The "c_user" cookie shown above enables Facebook to identify a specific user when they are logged in to their account. The "c_user" cookie stores a user's unique ID, which is associated with their Facebook profile. This ID enables Facebook to track user interactions on its platform and across sites that use Facebook plugins, such as adding items to a cart, clicking "Like" buttons, or engaging with comment sections. When combined with other data sent to the Facebook domain, this cookie allows Meta to track users' browsing activities. Facebook uses this data for various purposes, such as personalizing content, enhancing ad targeting accuracy, and refining its user experience.

60. In particular, by identifying users who have shown interest in certain products or content, the facebook.com cookies enable Meta's advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Meta's ad network.[5] These cookies allow Meta to collect data on how users interact with websites, regardless of whether they have a Facebook account or are logged in.[6]

61. Defendants identified the fr cookie shown above as an "Advertising Cookie" used on the Website in the Cookie Policy and described its purpose as follows:

The facebook.com cookies allow Meta to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data,

[5] *Id.*; https://allaboutcookies.org/what-data-does-facebook-collect.
[6] https://allaboutcookies.org/what-data-does-facebook-collect.

(v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses).[7]

62. The data that Defendants cause to be sent to Meta after users visit these Websites and reject cookies is representative of the data Defendants cause to be sent to Meta when users visit other Websites after rejecting cookies.

63. Meta utilizes the data collected through the facebook.com cookies for its own purposes, including by using the data to tailor content and target advertisements to users. This includes practices such as (i) **Ad Targeting and Retargeting**, in which Meta uses the facebook.com cookie to track users' online behavior across different sites, building a profile based on their browsing habits, purchases, and interactions. This profile enables Facebook to deliver highly targeted ads within the Facebook ecosystem and on other sites that are part of Facebook's Audience Network; (ii) **Conversion Tracking**, in which Meta uses the facebook.com cookie to enable business partners to track specific actions users take after viewing or clicking on a Facebook ad, such as making a purchase or signing up for a newsletter; (iii) **Audience Insights and Analytics**, in which Meta uses the facebook.com cookie to provide data to businesses on user demographics, interests, and behaviors across their sites and apps; and (iv) **Cross-Device and Cross-Platform Tracking**, in which Meta uses the facebook.com cookie to support tracking users across devices and platforms, so that ads are targeted consistently regardless of the device a user is on. This ensures that advertisers can follow users across devices.

### 3. Google Cookies.

64. Defendants caused third party cookies to be transmitted to and from the browsers and devices of users of the Websites, even after users disabled all cookies (including "Functional and Analytics" cookies),[8] to and from the **www.google.com**, **www.google-analytics.com**, and **doubleclick.net** domains. Each of these domains is associated with Google LLC's digital advertising and analytics platform that collects user information via cookies to assist Google in

[7] *Id.*

[8] In the Privacy Preference Center, Defendant specifically disclosed **doubleclick.net** cookies as "Functional and Analytics" cookies in use on the Website that could be disabled.

performing data collection, behavioral analysis, user retargeting, and analytics.[9] Google serves targeted ads to web users across Google's ad network, which spans millions of websites and apps. Nearly 20% of web traffic is tracked by Google's DoubleClick cookies.[10] Google's cookies help it track whether users complete specific actions after interacting with an ad (e.g., clicking a link or making a purchase) and provide analytic metrics that advertisers use to measure ad campaign performance. Further, by identifying users who have shown interest in certain products or content, Google's cookies cause its advertising platform to enable advertisers to show relevant ads to those users when they visit other websites within Google's ad network.[11]

65. Specifically, Google sends cookies when a web user visits a webpage that shows Google Marketing Platform advertising products and/or Google Ad Manager ads.[12] "Pages with Google Marketing Platform advertising products or Google Ad Manager ads include ad tags that instruct browsers to request ad content from [Google's] servers. When the server delivers the ad content, it also sends a cookie. But a page doesn't have to show Google Marketing Platform advertising products or Google Ad Manager ads for this to happen; it just needs to include Google Marketing Platform advertising products or Google Ad Manager ad tags, which might load a click tracker or impression pixel instead." *Id.* As Google explains, "Google Marketing Platform advertising products and Google Ad Manager send a cookie to the browser after any impression, click, or other activity that results in a call to our servers." *Id.*

66. Google also uses cookies in performing analytical functions. As Google explains, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[13] "To measure a website . . . [one] add[s] a small piece of

---

[9] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).

[10] *See, e.g.* https://www.ghostery.com/whotracksme/trackers/doubleclick.

[11] *See, e.g.* About cross-channel remarketing in Search Ads 360 (available at https://support.google.com/searchads/answer/7189623?hl=en); About dynamic remarketing for retail (available at https://support.google.com/google-ads/answer/6099158?hl=en&sjid=11962135750754589O8-NC).

[12] *See* How Google Marketing Platform advertising products and Google Ad Manager use cookies (available at https://support.google.com/searchads/answer/2839090?hl=en&sjid=11962135750754589O8-NC); *see also* Cookies and user identification (available at https://developers.google.com/tag-platform/security/concepts/cookies).

[13] How Google Analytics Works (available at

JavaScript measurement code to each page on [a] site." *Id.* Then, "[e]very time a user visits a webpage, the tracking code will collect . . . information about how that user interacted with the page." *Id.* Google Analytics enables website owners to "measure when someone loads a page, clicks a link, [ ] makes a purchase;" "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; and "views their shopping cart."[14]

67. Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data—including whether a user is located in California.[15]

68. For example, the Google software code that Defendant Reckitt caused to be stored on and executed by the Durex Website user's device caused the following data to be sent to Google's advertising domain, at doubleclick.net:

https://support.google.com/analytics/answer/12159447?hl=en).

[14] Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://developers.google.com/analytics/devguides/collection/ga4/events).

[15] *See* About the Google Tag (available at https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at https://support.google.com/searchads/answer/7298581?hl=en&sjid=1196213575075458908-NC&visit_id=638670675669576522-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735).

**Request** Header Query Body Cookies Raw | Summary +

| Key | Value |
|---|---|
| random | 1708106761324 |
| cv | 11 |
| fst | 1708106761324 |
| bg | ffffff |
| guid | ON |
| async | 1 |
| gtm | 45He42e0v76901893za200 |
| gcd | 13l3l3l3l1 |
| dma | 0 |
| u_w | 1920 |
| u_h | 1080 |
| url | https://www.durexusa.com/collections/all |
| ref | https://www.durexusa.com/collections |
| hn | www.googleadservices.com |
| frm | 0 |
| tiba | Shop All Condoms, Personal Lubricants & Sex Toys \| Durex® |
| npa | 0 |
| pscdl | noapi |
| auid | 818936921.1708103459 |
| uaa | x86 |
| uab | 64 |
| uafvl | Not%20A(Brand;99.0.0.0\|Google%20Chrome;121.0.6167.185\|Chromium;121.0.6167.185 |
| uamb | 0 |
| uap | Windows |
| uapv | 10.0.0 |
| uaw | 0 |
| fledge | 1 |
| rfmt | 3 |
| fmt | 4 |

69. The "npa" parameter refers to "Non-Personalized Ads." When npa is set to 1, it indicates non-personalized ads preference is enabled. Here, npa is set to 0, indicating that standard (personalized) ads are enabled.

70. The "url" parameter tells Google the exact url on the website that the user is visiting, and the "tiba" parameter contains the page title.

71. The "uafvl", "uaa", and "uap" parameters tell Google what device and browser the user is utilizing.

72. In another example, the Mucinex Website caused similar data to be sent to Google's advertising domain. Like the Durex Website data, the Mucinex Website data disclosed to Google the user's browsing activity and device information:

Request Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| random | 1708109883707 |
| cv | 11 |
| fst | 1708109883707 |
| bg | ffffff |
| guid | ON |
| async | 1 |
| gtm | 45He42e0v6104840za220 |
| gcd | 13l3l3l3l1 |
| dma | 0 |
| u_w | 1920 |
| u_h | 1080 |
| url | https://www.mucinex.com/products/mucinex%C2%AE-dm-extended-release-bi-layer-tablets |
| ref | https://www.mucinex.com/collections/cough-and-chest-congestion |
| hn | www.googleadservices.com |
| frm | 0 |
| tiba | Mucinex DM 12 Hour Extended Release Bi-Layer Tablets\| Mucinex USA |
| npa | 0 |
| pscdl | noapi |
| auid | 2071288955.1708104080 |
| uaa | x86 |
| uab | 64 |
| uafvl | Not%20A(Brand;99.0.0.0\|Google%20Chrome;121.0.6167.185\|Chromium;121.0.6167.185 |
| uamb | 0 |
| uap | Windows |
| uapv | 10.0.0 |
| uaw | 0 |
| fledge | 1 |
| rfmt | 3 |
| fmt | 4 |

73. Along with this data, the Websites caused cookie data to be sent to Google. The Durex Website, for example, caused the following cookie data to be sent to Google:

**Request** Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| ar_debug | 1 |
| IDE | AHWqTUn4P4dYIXQljjuNMootkWIb4eA1TchAfSgoG3Thphk24mq4NbndvRDcIV5I |
| receive-cookie-deprecation | 1 |

74. The Mucinex Website caused identical cookie data to be sent to Google:

**Request** Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| ar_debug | 1 |
| IDE | AHWqTUn4P4dYIXQljjuNMootkWIb4eA1TchAfSgoG3Thphk24mq4NbndvRDcIV5I |
| receive-cookie-deprecation | 1 |

75. According to Google, the "IDE" cookie is an "advertising" cookie, used to show Google ads on non-Google sites," and "to personalize the ads you see."[16]

76. Finally, the data sent to Google contained the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

77. The data that Defendant Reckitt causes to be sent to Google after users visit these Websites and reject cookies is representative of the data Defendants cause to be sent to Google when users visit the other Websites after rejecting cookies.

78. Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie caused Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience segments based on shared

---

[16] https://policies.google.com/technologies/cookies?hl=en-US. *See also* https://business.safety.google/adscookies/

traits (such as females, Millennials, Californians, etc.), and to perform targeted advertising and marketing analytics.

79. Thus, the Google cookies used on the Websites caused Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected through the cookie enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits travel-related websites, Google will show her more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as renaming their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build leads and sales by bringing previous visitors back to your website to complete what they started."[17]

80. Further, in its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance. These capabilities are critical to the value of the products we deliver to customers today."[18] Thus, Google can have the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

[17] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).
[18] Shared Data Under Measurement Controller-Controller Data Protection Terms (available at https://support.google.com/analytics/answer/9024351).

**4. TikTok Cookies.**

81. Defendants also caused third party cookies to be transmitted to and from the Website users' browsers and devices, even after users elected to disable all cookies, to and from the **analytics.tiktok.com** domain. This domain is associated with TikTok for Business, a suite of tools offered by TikTok, a social media platform owned by ByteDance Ltd., known for short-form video sharing.[19] The TikTok platform is used to create and share videos, and it utilizes cookies for various purposes including assisting brands and marketers to create, manage, and optimize ad campaigns on the platform.[20]

82. TikTok utilizes analytics.tiktok.com cookies to collect data on user interactions with websites that have integrated TikTok's tracking technologies (such as the Websites). These cookies are used to "measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[21] TikTok further explains that it uses cookies to "match events with people who engage with your content on TikTok. Matched events are used to improve measurement and optimize ad campaigns. They can also contribute to building your retargeting and engagement audiences." *Id.* These cookies enable TikTok to recognize and track users across different sessions and domains (i.e., cross-site tracking) and to collect and synchronize user data to observe and evaluate TikTok user behavior.

83. These cookies enable TikTok to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, including *email addresses and phone numbers*; (v) demographic information, (vi) interests and

---

[19] *See* Our advertising and measurement cookies (available at https://business.safety.google/adscookies/).

[20] *See, e.g.*, TikTok for Business (https://ads.tiktok.com/business/en-US/products/ads; and https://ads.tiktok.com/business/en-US/products/measurement); TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[21] TikTok Business Help Center; Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

preferences, (vii) shopping behaviors, (viii) device information, (ix) session information, (x) user identifiers, and (xi) geolocation data in the form of the IP address.[22]

84. For example, the TikTok software code that Defendants caused to be stored on and executed by the Enfamil Website user's device caused the following data to be sent to TikTok's domain, at https://analytics.tiktok.com/api/v2/pixel/act:

Request Header Query Body Cookies Raw Summary + PLAIN


```
{
  "_inspection": {},
  "action": "Metadata",
  "auto_collected_properties": {
    "content_data": {
      "json_ld": "[{\"@context\":\"https://schema.org\",
      \"@type\":\"Product\",\"@id\":\"https://www.enfamil.com/products/
      enfamil-neuropro-infant-formula/powder-tub-20-7-oz-tub/\",
      \"image\":\"https://cdn.shopify.com/s/files/1/2235/8247/products/
      130062068017InfantNeuroPro2_-FLHuMO620.7ozTub121321_RSO_1.png?
      v=1693488286\",\"name\":\"Enfamil® NeuroPro™ Infant Formula -
      Powder - 20.7 oz Tub\",\"offers\":{\"@type\":\"Offer\",
      \"priceCurrency\":\"USD\",\"price\":\"34.99\",
      \"priceValidUntil\":\"2025-03-24\",\"itemCondition\":\"http://
      schema.org/NewCondition\",\"availability\":\"http://schema.org/
      InStock\",\"url\":\"https://www.enfamil.com/products/
      enfamil-neuropro-infant-formula/powder-tub-20-7-oz-tub/\"},
      \"brand\":{\"@type\":\"Organization\",\"name\":\"Enfamil\"},
      \"identifier\":{\"@type\":\"PropertyValue\",
      \"propertyID\":\"Variant ID\",\"value\":\"2530484027402\"},
      \"description\":\"Enfamil NeuroPro is the only leading formula
      that has Omega 3 DHA* in amount experts recommend. Enfamil
      NeuroPro formula is backed by research and clinical studies.\",
      \"sku\":\"3264230|EA\",\"gtin\":\"300875121078\"},{\"review\":
      [{\"dateCreated\":\"2021-05-17T18:07:23.000+00:00\",
      \"datePublished\":\"2023-09-21T11:29:40.000+00:00\",
      \"headline\":\"Growth update of my daughter\",\"reviewBody\":\"I
      have been use this product since 2/10/2019\\r\\nWhen I had a
```


[22] *Id.*; *see also* TikTok for Business: Enhance Data Postback with the TikTok Pixel (https://ads.tiktok.com/help/article/enhance-data-postback-with-the-tiktok-pixel?lang=en); TikTok for Business: Advanced Matching for Web (available at https://ads.tiktok.com/help/article/advanced-matching-web?redirected=1); TikTok for Business: About TikTok Pixel (available at https://ads.tiktok.com/help/article/tiktok-pixel?lang=en).

```
"context": {
  "ad": {
    "jsb_status": 2,
    "sdk_env": "external"
  },
  "device": {
    "platform": "pc"
  },
  "index": 2,
  "library": {
    "name": "pixel.js",
    "version": "2.1.33"
  },
  "page": {
    "referrer": "https://www.enfamil.com/products/
    newborn-infant-formula/",
    "url": "https://www.enfamil.com/products/
    enfamil-neuropro-infant-formula/powder-tub-20-7-oz-tub/"
  },
  "pageview_id": "pageId-1711321593248-2953302922767",
  "pixel": {
    "code": "CBK4PS3C77UDK33PVSJG",
    "codes": "CBK4PS3C77UDK33PVSJG",
    "runtime": "1"
  },
  "session_id":
  "017f70aa-ea33-11ee-a37b-08c0eb4a42f2::SJUYPfYDKfoWPNEV7bUJ",
  "user": {
    "anonymous_id": "JCEXJQ89bdeOtvZmeHpmSoNGxDi"
  },
  "userAgent": "Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7)
  AppleWebKit/537.36 (KHTML, like Gecko) Chrome/123.0.0.0 Safari/537.
  36",
  "variation_id": "default"
},
"event_id": "",
"is_onsite": false,
"message_id": "messageId-1711321616792-1807741786538",
"properties": {},
"signal_diagnostic_labels": {
  "hashed_email": {
    "label": "missing"
  },
  "hashed_phone": {
    "label": "missing"
  },
  "raw_auto_email": {
    "label": "missing"
  },
  "raw_auto_phone": {
    "label": "missing"
  },
  "raw_email": {
    "label": "missing"
  },
  "raw_phone": {
    "label": "missing"
  }
},
"timestamp": "2024-03-24T23:06:56.792Z"
}
```

(verbose lines omitted for brevity.)

85. This data transmitted to TikTok is extensive. It discloses, for example, the user's device and browser. It also contains the webpage URL that the user is visiting, as well as the prior page that the user saw (the "referrer"). Further, it contains extensive data regarding the page itself. For instance, although omitted from the screenshot above, the data even includes the product's reviews.

86. The data also includes the "session_id," which is a unique identifier generated by TikTok to track a user's activity. This allows TikTok to correlate the user's behavior from a browsing session, including page views and conversions, to a particular user to enhance advertising measurement, attribution, and targeting.[23]

87. Along with this data, the Websites caused cookie data to be sent to TikTok. For example, the Enfamil Website caused the following cookie data to be sent alongside the data displayed above:




88. According to TikTok's documentation, the "_ttp" cookie is one of the company's advertising cookies, the purpose of which is "[t]o measure and improve the performance of your advertising campaigns and to personalize the user's experience (including ads) on TikTok."[24]

89. Finally, the data sent to TikTok included the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

90. The data that Defendants cause to be sent to TikTok after users visit the Enfamil Website and reject cookies is representative of the data Defendant Reckitt causes to be sent to TikTok when users visit the other Websites after rejecting cookies.

---

[23] *See, e.g.*, How to get TikTok session id? (available at https://gbtimes.com/how-to-get-tiktok-session-id/)

[24] See TikTok for Business: Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

91. By collecting this user data, TikTok performs user behavior tracking, i.e., monitoring user actions like page views, clicks, and interactions to understand user engagement; advertising optimization, i.e., gathering data to enhance the relevance and effectiveness of TikTok advertising campaigns; and performance measurement (i.e., assessing the success of marketing efforts by analyze user responses to ads and content).[25]

92. Further, TikTok's Automatic Advanced Matching feature functions as follows: "When a visitor lands on your website and inputs customer information during registration, sign-in, contact, or checkout on a website where you installed your pixel, Automatic Advanced Matching will capture information from those fields. …TikTok will use hashed information to link event information to people on TikTok. Tiktok may use matched events to better attribute events to TikTok ads, optimize advertisers' future campaigns, and depending on advertisers' and users' settings, TikTok may also add people to advertisers' retargeting or engagement audiences."[26]

**5. LiveRamp Cookies.**

93. Defendants also caused third party cookies to be transmitted to and from Website users' browsers and devices, even after users elected to disable all cookies, to and from the **rlcdn.com** domain.[27] This domain is associated with LiveRamp, a software company that allows businesses to combine customer data from various online and offline sources and leverage that data for marketing and analytics purposes.[28] LiveRamp's cookies are used to create an online identification code for the purpose of recognizing users' devices and tracking their user behavior.

94. These cookies enable LiveRamp to obtain and store at least the following user data: browsing history, visit history, website interactions, user input data (such as email address), demographic information, interests and preferences, device information, user identifiers, and

[25] *See* TikTok for Business: Using Cookies with TikTok Pixel (available at https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en).

[26] TikTok for Business: How to set up Automatic Advanced Matching (available at https://ads.tiktok.com/help/article/how-to-set-up-automatic-advanced-matching?lang=en).

[27] *See* LiveRamp Product and Service Privacy Notice (available at https://liveramp.com/privacy/service-privacy-policy/) ("LiveRamp cookie domain names include both 'rlcdn' and 'pippio'".).

[28] *See* https://liveramp.com/privacy/service-privacy-policy/#section1a; *see also* LiveRamp Data Marketplace (available at https://liveramp.com/data-marketplace/).

geolocation data (including IP addresses), on the Websites. The unique user identifier enables LiveRamp to sell a user's unique data for use in online and cross-channel advertising (including targeted advertising and email marketing).

95. LiveRamp explains in its Privacy Notice the user data it receives from its cookies installed on "partner websites" and how it uses (and monetizes) that data as follows:

> [The website] partner may sell or share personal information collected from you, such as your email, cookies set on your browser, IP address, or information about your browser or operating system, with LiveRamp. LiveRamp uses this information to create an online identification code for the purpose of recognizing your device. This code may be placed in our partners' cookie and for use in online and cross-channel advertising (including targeted advertising and email marketing), or LiveRamp may connect it to LiveRamp's own 3rd-party cookie and other identifiers. In addition, by associating an email address with a cookie, LiveRamp and third parties can link your browsing activity across different websites and other applications and services to your specific device associated with the email address, identifying the user behind the device. This means that, even when browsing unrelated sites, your online activity can be connected to you for advertising and other marketing-related purposes, including email marketing and offline advertising...
>
> The personal data and identifiers we collect (for instance, a cookie ID) may be linked to other personal data and identifiers through known associations and/or identity resolution (for instance, an identifier derived from or associated with a hashed email address and LiveRamp cookie 1234 might be associated with partner cookie 5678), and shared with advertising partners and other third party advertising companies for the purpose of enabling interest-based content or targeted advertising throughout your online and offline experiences (e.g., web, TV [MVPDs], connected TV, mobile applications, email marketing and other media). These third parties may in turn use this identifier to link demographic or interest-based information you have provided in your interactions with them. Note that LiveRamp does not itself provide the service of targeted advertising (sometimes referred to as "cross-context advertising") but, rather, processes and transfers data to an advertiser's advertising platform so that platform can provide targeted advertising services...[29]

**6. Salesforce Cookies.**

96. Defendants also caused data and cookies to be transmitted to and from Website users' browsers and devices, even after users elected to disable all cookies (including "Advertising" cookies), to and from the **evergage.com** domain, which points to Salesforce's Interaction Studio product. Salesforce describes that product as follows:

[29] *Id.*

> Interaction Studio enhances the power of Marketing Cloud with expanded real-time personalization. Companies use Interaction Studio to tailor interactions with customers and prospects to increase loyalty, engagement, and conversions. Using real-time cross-channel personalization and machine learning capabilities, Interaction Studio complements Marketing Cloud's robust customer data, audience segmentation, and engagement platform.[30]

97. For instance, Defendants configured the Enfamil Website to send the following data, along with cookie data, to https://reckittbenckiser.us-1.evergage.com, which is hosted by Salesforce:

**Request** Header Query Body Cookies Raw Summary +

| Key | Value |
|---|---|
| .top | 3014 |
| item | {"type":"Product","_id":"2530484027402","categories":[{"type":"c","_id":"Formula"}],"dimensions":{"BabyStage":["Infant","Newborn"],"FeedingIssue":[],"ProductFamily":["NeuroPro Sensitive"],"ProductType":["Enfamil NeuroPro"],"SpecialDietaryNeeds":["No"]}} |
| action | Product Detail |
| .bv | 16 |
| _ak | reckittbenckiser |
| _ds | engage |
| .scv | 621 |
| channel | Web |
| _r | 463591 |
| .anonId | 9e243ccd3b547706 |
| _anon | true |

98. This data informs Salesforce of the exact product that the user was viewing on the Website. The data also includes an "anonId," which is an identifier used to uniquely track the user throughout all interactions with the Website.

99. In addition, Defendants caused the user's IP address and device information to be sent to Salesforce.

100. The data that Defendants cause to be sent to Salesforce after users visit the Enfamil Website and reject cookies is representative of the data Defendant Reckitt causes to be sent to Salesforce when users visit the other Websites after rejecting cookies.

**7. Trade Desk Cookies.**

[30] Salesforce Help: Marketing Cloud Personalization (available at https://help.salesforce.com/s/articleView?id=sf.mc_isev_interaction_studio.htm&type=5).

101. Defendants also caused third party cookies to be transmitted to and from Website users' browsers and devices, even after users elected to disable all cookies, to and from the adsrvr.org domain.

102. The **adsrvr.org** domain is associated with The Trade Desk, Inc., a digital advertising company that offers a cloud-based ad-buying platform that enables businesses to plan, manage, optimize, and measure data-driven digital advertising campaigns.[31] The Trade Desk uses insight.adsrvr.org cookies to collect data on users such as their geographic locations, the type of device users are using, and users' interests as inferred from their web browsing or app usage activity."[32] This data helps The Trade Desk personalize ad content and track users across the internet.[33]

103. The Trade Desk acknowledges that its cookies' ability "to collect, augment, analyze, use and share data relies upon the ability to uniquely identify devices across websites and applications, and to collect data about user interactions with those devices for purposes such as serving relevant ads and measuring the effectiveness of ads."[34]

**8. Snapchat Cookies.**

104. Defendants also caused third party cookies to be transmitted to and from Website users' browsers and devices, even after users elected to disable all cookies, to and from the tr.snapchat.com domain.

105. The subdomain **tr.snapchat.com** is associated with Snap Inc., the social media company that owns Snapchat. Snapchat is multimedia messaging app that lets users share photos, videos, text, and drawings—often designed to disappear after being viewed. Snapchat uses tr.snapchat.com cookies to collect data on browsing history, choices, and interactions with advertisements.[35] This data helps Snap personalize ad content and track users across the internet.[36] As Snap explains, it uses the data collected by Snapchat cookies "for optimization,

---

[31] *See* The Trade Desk, Inc. 2023 Form 10-K (filed February, 15 2024).
[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *See* Snapchat Business Help Center: Directly Implement the Pixel On Your Website (available at https://businesshelp.snapchat.com/s/article/pixel-direct-implementation).
[36] *Id.*

custom audience creation, look-alike modeling, reporting, machine learning, and targeting capabilities. All uses are … meant to deliver better results for our ad products."[37]

106. Snapchat cookies allow Snap to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) demographic information, including age and location,[38] (v) user input data, including name and email address,[39] (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and/or (xii) geolocation data.

**D. The Private Communications Collected are Valuable.**

107. As part of their regular course of business, Defendants targeted California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendants' and the Third Parties' profit, all of the Private Communications transferred by the cookies which Defendants caused to be placed on Plaintiffs' and other California Website users' devices without their knowledge or consent. Defendants knew the location of consumers like Plaintiffs and the Class members either prior to or shortly after causing the Third Parties to use cookies on their devices.

108. The Private Communications that the Third Parties tracked and collected by way of the cookies on the Websites are valuable to Defendants as well as the Third Parties. Defendants can use the data to create and analyze the performance of marketing campaigns, website design, product placement, and target specific users or groups of users for advertisements. For instance, if Defendants wanted to market certain of their consumer goods products to consumers in California, Defendants could use the data collected by the Third Parties to monitor the location of users who visit webpages related to specific products, then advertise similar products to those particular users when they visit other webpages. The third-party cookies

[37] Snapchat Business Help Center: Pixel Implementation FAQ (available at https://businesshelp.snapchat.com/s/article/snap-pixel-faq); *see also* Snapchat Business Help Center: About Snap Pixel (available at https://businesshelp.snapchat.com/s/article/snap-pixel-about).

[38] *See* Snap for Developers: Parameters (available at https://developers.snap.com/api/marketing-api/Conversions-API/Parameters).

[39] *Id.*

also enable Defendants to target online advertisements to users when they visit ***other*** websites, even those completely unrelated to Defendants and their products.

109. Data about users' browsing history enables Defendants to spot patterns in users' behavior on the Websites and their interests in, among other things, Defendants' consumer goods products. On a broader scale, it enables Defendants to gain an understanding of trends happening across their brands and across the consumer markets for their products. All of this helps Defendants further monetize the Websites and maximize revenue by collecting and analyzing user data.

110. The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[40] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

111. Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

112. Through their false representations and aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to track users' Private Communications on the Websites using third-party cookies, Defendants unjustly enriched themselves at the cost of consumer privacy and choice, when the consumer could otherwise have the ability to choose if and how she would monetize her data.

## **PLAINTIFFS' EXPERIENCES**

**Tinamarie Barrales**

[40] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

113. Plaintiff Barrales visited the Enfamil Website on multiple occasions, including in 2021, 2022, and May 2024, to seek and obtain information about Enfamil products while located in California. In particular, Plaintiff Barrales visited the Enfamil Website to search for Enfamil products, determine whether particular products were available for purchase after she was unable to find them at a local store, and look for coupons and other offers.

114. Plaintiff Barrales' visits to the Enfamil Website were consistent with a typical Website user's visits seeking information about Enfamil products. During her visits, Plaintiff Barrales browsed product information, clicked links, and used the Website's search functionality to search for Enfamil products and coupons. Plaintiff Barrales also allowed the Website to access her location and/or entered location information, including her address and ZIP code, to obtain information relevant to her search for Enfamil products. Plaintiff Barrales is not a consumer advocate, "tester," or compliance auditor who visited the Enfamil Website to test or evaluate Defendants' privacy practices.

115. When Plaintiff Barrales visited the Enfamil Website, the Website immediately detected that she was a visitor in California and presented her with Defendants' popup cookie consent banner, which provided the option to "Disable All" cookies or disable such cookies through the "Manage Preferences" link. Plaintiff Barrales viewed Defendants' representation on the popup cookie consent banner that, "Reckitt uses cookies for personalized advertising and sharing with third parties. If you agree with this use, click **Allow All**. To opt out, click **Disable All**. To allow some cookies and deny others, click **Manage Preferences**." Plaintiff Barrales also viewed Defendants' additional representation that users could "Disable All" cookies.

116. Plaintiff Barrales selected and clicked the "Disable All" cookies button. Plaintiff Barrales believed that selecting "Disable All" cookies on the popup cookie consent banner found on the Enfamil Website would allow her to opt out of, decline, and/or disable all cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks, analytics services, and/or social media companies for the purposes of providing personalized content, advertising, and analytics services).

117. In selecting the "Disable All" cookies button, Plaintiff Barrales gave Defendants notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the Enfamil Website. Further, Plaintiff Barrales specifically rejected, based on Defendants' representations, those cookies used for "personalized advertising and sharing with third parties." In reliance on these representations and promises, only then did Plaintiff Barrales continue browsing the Enfamil Website.

118. Even before the popup cookie consent banner appeared on the screen, Defendants nonetheless caused cookies and tracking technologies, including those used for personalized content, advertising, analytics, and social media, to be placed on Plaintiff Barrales's device and/or transmitted to the Third Parties along with user data, without Plaintiff Barrales's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Barrales that she could disable the use and/or placement of all cookies and tracking technologies while she browsed the Enfamil Website was false. Contrary to what Defendants made Plaintiff Barrales believe, she did not have a choice about whether third-party cookies would be placed on her device and/or transmitted to the Third Parties along with her user data; rather, Defendants had already caused that to happen.

119. Then, as Plaintiff Barrales continued to browse the Enfamil Website in reliance on the promises Defendants made in the cookie consent banner, and despite Plaintiff Barrales's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendants nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing personalized content, advertising, analytics, and social media content from the Third Parties on her device. In doing so, Defendants permitted the Third Parties to track and collect Plaintiff Barrales's Private Communications as Plaintiff browsed the Enfamil Website. As illustrated in the screenshot in paragraph 41 and further explained in paragraphs 42–106, her Private Communications—including the products and product categories she viewed or selected and the search terms she entered—were intercepted, collected, and used by third parties such as Facebook, Google, TikTok, and Snapchat.

120. Defendants' representations that consumers could "Disable All" cookies while Plaintiff Barrales and users browsed the Websites, or at least those involved in providing personalized content, advertising, and social media services, were untrue. Had Plaintiff Barrales known this fact, she would not have used the Enfamil Website. Moreover, Plaintiff Barrales reviewed the popup cookie consent banner prior to using the Enfamil Website. Had Defendants disclosed that they would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to disable all cookies, Plaintiff Barrales would have noticed it and would not have used the Enfamil Website or, at a minimum, she would have interacted with the Enfamil Website differently.

121. Plaintiff Barrales continues to desire to browse content featured on the Websites. Plaintiff Barrales would like to browse websites that do not misrepresent that users can disable all cookies and tracking technologies. If the Websites were programmed to honor users' requests to reject all cookies and tracking technologies, Plaintiff Barrales would likely browse the Enfamil Website (and the other Websites) again in the future, but will not do so until then. Plaintiff Barrales regularly visits websites that feature content similar to that of the Websites. Because Plaintiff Barrales does not know how the Websites are programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Websites honor users' requests to disable all cookies and tracking technologies, Plaintiff Barrales will be unable to rely on Defendants' representations when browsing the Websites in the future absent an injunction that prohibits Defendants from making misrepresentations on the Websites. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Barrales is not a software developer and has not received training with respect to HTTP network calls.

122. The delayed discovery rule applies to Plaintiff Barrales' claims because, at the time of her visits to the Enfamil Website, she was unaware that even though she declined all

cookies, Defendants caused cookies, including the Third Parties' cookies, to be sent to her browsers, stored on her devices, and intercepted by the Third Parties along with her private user data. Nothing about Plaintiff's experiences on the Enfamil Website would have alerted a reasonable user that her selections were not being honored because the privacy violations occurred through hidden, technical processes not visible to ordinary users. Plaintiff Barrales lacked the technical expertise and specialized tools necessary to determine whether the Websites honored her opt-out selections or instead continued transmitting her data notwithstanding her selections, and she did not discover Defendant's conduct until a later investigation revealed it. Plaintiff Barrales first learned about the Enfamil Website's privacy violations from her counsel on or around May 2024.

**David Frankle**

123. Plaintiff Frankle visited at least three of Defendant Reckitt's Websites to seek and obtain information about Defendant's products while located in California, on multiple occasions during the last four years. In particular, Plaintiff Frankle visited the Durex Website in or around December 2023 and March 2024 to obtain information about Durex products and search for available coupons and other offers. Plaintiff Frankle also visited the Biofreeze Website in or around December 2023 while training for a 5K to obtain information about Biofreeze products, and visited the Mucinex Website in or around December 2023 to obtain information about products relating to flu treatment and prevention.

124. Plaintiff Frankle's visits to the Websites were consistent with an ordinary consumer's visits seeking information about Defendant's products. During his visits, Plaintiff Frankle browsed product information, viewed various products, and clicked links and navigated webpages relating to products in which he was interested. On the Durex Website, Plaintiff Frankle also searched for coupons and other offers relating to Durex products. Plaintiff Frankle is not a consumer advocate, "tester," or compliance auditor who visited the Websites to test or evaluate Defendant's privacy practices.

125. When Plaintiff Frankle visited the Websites, the Websites immediately detected that he was a visitor in California and presented him with Defendants' popup cookie consent

banner, which provided the option to "Disable All" cookies or disable such cookies through the "Manage Preferences" link. Plaintiff Frankle viewed Defendant's representation on the popup cookie consent banner that, "Reckitt uses cookies for personalized advertising and sharing with third parties. If you agree with this use, click **Allow All**. To opt out, click **Disable All**. To allow some cookies and deny others, click **Manage Preferences**." Plaintiff Frankle also viewed Defendant's additional representation that users could "Disable All" cookies.

126. Plaintiff Frankle selected and clicked the "Disable All" cookies button. Plaintiff Frankle believed that selecting "Disable All" cookies on the popup cookie consent banner found on the Websites would allow him to opt out of, decline, and/or disable all cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks, analytics services, and/or social media companies for the purposes of providing personalized content, advertising, and analytics services).

127. In clicking the "Disable All" cookies button, Plaintiff Frankle gave Defendant Reckitt notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Websites. Further, Plaintiff Frankle specifically rejected, based on Defendant Reckitt's representations, those cookies used for "personalized advertising and sharing with third parties." In reliance on these representations and promises, only then did Plaintiff Frankle continue browsing the Websites.

128. Even before the popup cookie consent banner appeared on the screen, Defendant Reckitt nonetheless caused cookies and tracking technologies, including those used for personalized content, advertising, analytics, and social media, to be placed on Plaintiff Frankle's device and/or transmitted to the Third Parties along with user data, without Plaintiff Frankle's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Frankle that he could disable the use and/or placement of all cookies and tracking technologies while he browsed the Websites was false. Contrary to what Defendant Reckitt made Plaintiff Frankle believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant Reckitt had already caused that to happen.

129. Then, as Plaintiff Frankle continued to browse the Websites in reliance on the promises Defendant Reckitt made in the cookie consent banner, and despite Plaintiff Frankle's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant Reckitt nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing personalized content, advertising, analytics, and social media content from the Third Parties on his device. In doing so, Defendant Reckitt permitted the Third Parties to track and collect Plaintiff Frankle's Private Communications as Plaintiff browsed the Websites. As illustrated in the screenshot in paragraph 41 and further explained in paragraphs 42–106, his Private Communications—including the products and product categories he viewed or selected—on the Durex Website were intercepted, collected, and used by third parties such as Facebook, Google, Snapchat, TikTok, Trade Desk, and LiveRamp. As shown in the screenshot in paragraph 41 and further explained in paragraphs 42–106, his Private Communications—including the products and product categories he viewed or selected—on the Biofreeze Website were intercepted, collected, and used by Third Parties such as Google. As detected in a 2024 investigation and further explained in paragraphs 42–106, his Private Communications—including the products and product categories he viewed or selected—on the Mucinex Website were intercepted, collected, and used by Third Parties such as Facebook, Google, and TikTok.

130. Defendant Reckitt's representations that consumers could "Disable All" cookies while Plaintiff Frankle and users browsed the Websites, or at least those involved in providing personalized content, advertising, and social media services, were untrue. Had Plaintiff Frankle known this fact, he would not have used the Websites. Moreover, Plaintiff Frankle reviewed the popup cookie consent banner prior to using the Websites. Had Defendant Reckitt disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to disable all cookies, Plaintiff Frankle would have noticed it and would not have used the Websites or, at a minimum, he would have interacted with the Websites differently.

131. Plaintiff Frankle continues to desire to browse content featured on the Websites. Plaintiff Frankle would like to browse websites that do not misrepresent that users can disable all cookies and tracking technologies. If the Websites were programmed to honor users' requests to disable all cookies and tracking technologies, Plaintiff Frankle would likely browse the Websites in the future, but will not do so until then. Plaintiff Frankle regularly visits websites that feature content similar to that of the Websites. Because Plaintiff Frankle does not know how the Websites are programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Websites honor users' requests to disable all cookies and tracking technologies, Plaintiff Frankle will be unable to rely on Defendant's representations when browsing the Websites in the future absent an injunction that prohibits Defendants from making misrepresentations on the Websites. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Frankle is not a software developer and has not received training with respect to HTTP network calls.

132. The delayed discovery rule applies to Plaintiff Frankle's claims because, at the time of his visits to the Websites, he was unaware that even though he declined all cookies on the Websites, Defendant Reckitt caused cookies, including the Third Parties' cookies, to be sent to his browsers, stored on his devices, and intercepted by the Third Parties along with his private user data. Nothing about Plaintiff's experiences on the Websites would have alerted a reasonable user that his selections were not being honored because the privacy violations occurred through hidden, technical processes not visible to ordinary users. Plaintiff Frankle lacked the technical expertise and specialized tools necessary to determine whether the Websites honored his opt-out selections or instead continued transmitting his data notwithstanding his selections, and he did not discover Defendant's conduct until a later investigation revealed it. Plaintiff Frankle first learned about the Durex Website's privacy violations from his counsel in or around February

2024, and he first learned about the violations on the Biofreeze and Mucinex Websites from his counsel in or around August 2025.

**Stacy Penning**

133. Plaintiff Penning visited at least two of Defendant Reckitt's Websites to seek and obtain information about Defendant's products while located in California, on multiple occasions during the last four years. In particular, Plaintiff Penning visited the K-Y Website in or around April and May 2024 and 2025 to obtain information about K-Y's "Duration" desensitizing gel, including information about the product, the company, and where the product was available for purchase near him. Plaintiff Penning also visited the Lysol Website in or around December 2024 and April 2025 to obtain information about Lysol disinfectant sprays and to learn more about the chemicals and ingredients contained in those products.

134. Plaintiff Penning's visits to the Websites were consistent with an ordinary consumer's visits seeking information about Defendant's products. During his visits to the K-Y Website, Plaintiff Penning viewed information about the Duration desensitizing gel, clicked links to review information about the product and K-Y's history, and used the Website's location-search functionality, including by entering his ZIP code to identify locations near him where the product was sold. During his visits to the Lysol Website, Plaintiff Penning browsed product and informational content, clicked on the "Our Products," "Resources," and "FAQs" sections, and used the Website's search functionality, including by entering search terms such as "disinfectant." Plaintiff Penning is not a consumer advocate, "tester," or compliance auditor who visited the Websites to test or evaluate Defendant's privacy practices.

135. When Plaintiff Penning first visited the aforementioned Websites, they immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which provided the option to "Disable All" cookies or disable such cookies through the "Manage Preferences" link. Plaintiff Penning viewed Defendant's representation on the popup cookie consent banner that, "Reckitt uses cookies for personalized advertising and sharing with third parties. If you agree with this use, click **Allow All**. To opt out, click **Disable All**. To allow some cookies and deny others, click **Manage Preferences**." Plaintiff

Penning also viewed Defendant's additional representation that users could "Disable All" cookies.

136. Plaintiff Penning selected and clicked the "Disable All" cookies button. Plaintiff Penning believed that selecting "Disable All" cookies on the popup cookie consent banner found on the Websites would allow him to opt out of, decline, and/or disable all cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks, analytics services, and/or social media companies for the purposes of providing personalized content, advertising, and analytics services).

137. In clicking the "Disable All" cookies button, Plaintiff Penning gave Defendant Reckitt notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Websites. Further, Plaintiff Penning specifically rejected, based on Defendant's representations, those cookies used for "personalized advertising and sharing with third parties." In reliance on these representations and promises, only then did Plaintiff Penning continue browsing the Websites.

138. Even before the popup cookie consent banner appeared on the screen, Defendant Reckitt nonetheless caused cookies and tracking technologies, including those used for personalized content, advertising, analytics, and social media, to be placed on Plaintiff Penning's device and/or transmitted to the Third Parties along with user data, without Plaintiff Penning's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Penning that he could disable the use and/or placement of all cookies and tracking technologies while he browsed the Websites was false. Contrary to what Defendant Reckitt made Plaintiff Penning believe, he did not have a choice about whether third-party cookies would be placed on his device and/or transmitted to the Third Parties along with his user data; rather, Defendant Reckitt had already caused that to happen.

139. Then, as Plaintiff Penning continued to browse the Websites in reliance on the promises Defendant Reckitt made in the cookie consent banner, and despite Plaintiff Penning's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant Reckitt nonetheless continued to cause the placement and/or transmission of cookies along with

user data, including those involved in providing personalized content, advertising, analytics, and social media content from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Penning's Private Communications as Plaintiff browsed the Websites. As illustrated in the screenshot in paragraph 41 and further explained in paragraphs 42–106, his Private Communications—including the products and product categories he viewed or selected and the search terms he entered—on the K-Y Website were intercepted, collected, and used by Third Parties such as Google, TikTok, Microsoft (clarity.ms), and Storygize. As detected in a 2024 investigation and further explained in paragraphs 42–106 , his Private Communications—including the products and product categories he viewed or selected and the search terms he entered—on the Lysol Website were intercepted, collected, and used by Third Parties such as Google and TikTok.

140. Defendant Reckitt's representations that consumers could "Disable All" cookies while Plaintiff Penning and users browsed the Websites, or at least those involved in providing personalized content, advertising, and social media services, were untrue. Had Plaintiff Penning known this fact, he would not have used the Websites. Moreover, Plaintiff Penning reviewed the popup cookie consent banner prior to using the Websites. Had Defendant Reckitt disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to disable all cookies, Plaintiff Penning would have noticed it and would not have used the Websites or, at a minimum, he would have interacted with the Websites differently.

141. Plaintiff Penning continues to desire to browse content featured on the Websites. Plaintiff Penning would like to browse websites that do not misrepresent that users can disable all cookies and tracking technologies. If the Websites were programmed to honor users' requests to disable all cookies and tracking technologies, Plaintiff Penning would likely browse the Websites in the future, but will not do so until then. Plaintiff Penning regularly visits websites that feature content similar to that of the Websites. Because Plaintiff Penning does not know how the Websites are programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Websites honor users' requests to disable all

cookies and tracking technologies, Plaintiff Penning will be unable to rely on Defendants' representations when browsing the Websites in the future absent an injunction that prohibits Defendants from making misrepresentations on the Websites. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Penning is not a software developer and has not received training with respect to HTTP network calls.

142. The delayed discovery rule applies to Plaintiff Penning's claims because, at the time of his visits to the Websites, he was unaware that even though he declined all cookies on the Websites, Defendant Reckitt caused cookies, including the Third Parties' cookies, to be sent to his browsers, stored on his devices, and intercepted by the Third Parties along with his private user data. Nothing about Plaintiff's experiences on the Websites would have alerted a reasonable user that his selections were not being honored because the privacy violations occurred through hidden, technical processes not visible to ordinary users. Plaintiff Penning lacked the technical expertise and specialized tools necessary to determine whether the Websites honored his opt-out selections or instead continued transmitting his data notwithstanding his selections, and he did not discover Defendant's conduct until a later investigation revealed it. Plaintiff Penning first learned about the Websites' privacy violations from his counsel in or August 2025.

**<u>Maria Santacruz</u>**

143. Plaintiff Santacruz visited the K-Y Website on one or more occasions, including in the spring of 2024, to seek and obtain information about K-Y products while located in California. In particular, Plaintiff Santacruz visited the K-Y Website to research a particular K-Y product in which she was interested and determine whether the product was available for purchase.

144. Plaintiff Santacruz's visits to the K-Y Website were consistent with an ordinary consumer's visits seeking information about K-Y products. During her visits, Plaintiff Santacruz

searched for a particular product using the Website's search functionality, including by entering search terms relating to the product, and clicked links and navigated webpages to obtain information about the product and its availability for purchase. Plaintiff Santacruz is not a consumer advocate, "tester," or compliance auditor who visited the K-Y Website to test or evaluate Defendant Reckitt's privacy practices.

145. When Plaintiff Santacruz visited the K-Y Website, the Website immediately detected that she was a visitor in California and presented her with Defendant Reckitt's popup cookie consent banner, which provided the option to click "Disable All" cookies or disable such cookies through the "Manage Preferences" link. Plaintiff Santacruz viewed Defendant Reckitt's representation on the popup cookie consent banner that, "Reckitt uses cookies for personalized advertising and sharing with third parties. If you agree with this use, click **Allow All**. To opt out, click **Disable All**. To allow some cookies and deny others, click **Manage Preferences**." Plaintiff Santacruz also viewed Defendant Reckitt's additional representation that users could "Disable All" cookies.

146. Plaintiff Santacruz selected and clicked the "Disable All" cookies button. Plaintiff Santacruz believed that selecting "Disable All" cookies on the popup cookie consent banner found on the K-Y Website would allow her to opt out of, decline, and/or disable all cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks, analytics services, and/or social media companies for the purposes of providing personalized content, advertising, and analytics services).

147. In selecting the "Disable All" cookies button, Plaintiff Santacruz gave Defendant Reckitt notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the K-Y Website. Further, Plaintiff Santacruz specifically rejected, based on Defendant Reckitt's representations, those cookies used for "personalized advertising and sharing with third parties." In reliance on these representations and promises, only then did Plaintiff Santacruz continue browsing the K-Y Website.

148. Even before the popup cookie consent banner appeared on the screen, Defendant Reckitt nonetheless caused cookies and tracking technologies, including those used for

personalized content, advertising, analytics, and social media, to be placed on Plaintiff Santacruz's device and/or transmitted to the Third Parties along with user data, without Plaintiff Santacruz's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Santacruz that she could disable the use and/or placement of all cookies and tracking technologies while she browsed the K-Y Website was false. Contrary to what Defendant Reckitt made Plaintiff Santacruz believe, she did not have a choice about whether third-party cookies would be placed on her device and/or transmitted to the Third Parties along with her user data; rather, Defendant Reckitt had already caused that to happen.

149. Then, as Plaintiff Santacruz continued to browse the K-Y Website in reliance on the promises Defendant Reckitt made in the cookie consent banner, and despite Plaintiff Santacruz's clear rejection of the use and/or placement of such cookies and tracking technologies, Defendant Reckitt nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing personalized content, advertising, analytics, and social media content from the Third Parties on her device. In doing so, Defendant Reckitt permitted the Third Parties to track and collect Plaintiff Santacruz's Private Communications as Plaintiff browsed the K-Y Website. As illustrated in the screenshot in paragraph 41 and further explained in paragraphs 42–106, her Private Communications—including the products and product categories she viewed or selected and the search terms she entered—on the K-Y Website were intercepted, collected, and used by Google, TikTok, Microsoft (clarity.ms), and Storygize.

150. Defendant Reckitt's representations that consumers could "Disable All" cookies while Plaintiff Santacruz and users browsed the Websites, or at least those involved in providing personalized content, advertising, and social media services, were untrue. Had Plaintiff Santacruz known this fact, she would not have used the K-Y Website. Moreover, Plaintiff Santacruz reviewed the popup cookie consent banner prior to using the K-Y Website. Had Defendant Reckitt disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to disable all cookies, Plaintiff

Santacruz would have noticed it and would not have used the K-Y Website or, at a minimum, she would have interacted with the K-Y Website differently.

151. Plaintiff Santacruz continues to desire to browse content featured on the Websites. Plaintiff Santacruz would like to browse websites that do not misrepresent that users can disable all cookies and tracking technologies. If the K-Y Website (and the other Websites) were programmed to honor users' requests to reject all cookies and tracking technologies, Plaintiff Santacruz would likely browse the Websites again in the future, but will not do so until then. Plaintiff Santacruz regularly visits websites that feature content similar to that of the Websites. Because Plaintiff Santacruz does not know how the Websites are programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Websites honor users' requests to disable all cookies and tracking technologies, Plaintiff Santacruz will be unable to rely on Defendant Reckitt's representations when browsing the Websites in the future absent an injunction that prohibits Defendant Reckitt from making misrepresentations on the Websites. The only way to determine what network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Santacruz is not a software developer and has not received training with respect to HTTP network calls.

152. The delayed discovery rule applies to Plaintiff Santacruz's claims because, at the time of her visits to the K-Y Website, she was unaware that even though she declined all cookies on the K-Y Website, Defendant Reckitt caused cookies, including the Third Parties' cookies, to be sent to her browsers, stored on her devices, and intercepted by the Third Parties along with her private user data. Nothing about Plaintiff's experiences on the K-Y Website would have alerted a reasonable user that her selections were not being honored because the privacy violations occurred through hidden, technical processes not visible to ordinary users. Plaintiff Santacruz lacked the technical expertise and specialized tools necessary to determine whether the Websites honored her opt-out selections or instead continued transmitting her data

notwithstanding her selections, and she did not discover Defendant Reckitt's conduct until a later investigation revealed it. Plaintiff Santacruz first learned about the K-Y Website's privacy violations from her counsel in or around May 2024.

**Eliza Soleimanian**

153. Plaintiff Soleimanian visited the Enfamil Website on multiple occasions, beginning in or around July 2024 and continuing through at least July 2026, to seek and obtain information about Enfamil products while located in California. In particular, Plaintiff Soleimanian visited the Enfamil Website to research infant formula and other Enfamil products for her infants, including to review product ingredients and prices and determine whether particular products were available for purchase online or at retailers near her.

154. Plaintiff Soleimanian's visits to the Enfamil Website were consistent with an ordinary consumer's visits seeking information about Defendants' products. During her visits, Plaintiff Soleimanian browsed and searched for infant formula and other Enfamil products, viewed individual product pages, reviewed information regarding product ingredients and prices, and clicked links and navigated webpages relating to products in which she was interested. Plaintiff Soleimanian also used the Website's location functionality to determine where products were available near her, including by allowing the Website to access her current location and/or entering her ZIP code. Plaintiff Soleimanian is not a consumer advocate, "tester," or compliance auditor who visited the Enfamil Website to test or evaluate Defendants' privacy practices.

155. When Plaintiff Soleimanian visited the Enfamil Website, the Website immediately detected that she was a visitor in California and presented her with Defendants' popup cookie consent banner, which provided the option to "Disable All" cookies or disable such cookies through the "Manage Preferences" link. Plaintiff Soleimanian viewed Defendants' representation on the popup cookie consent banner that, "Reckitt uses cookies for personalized advertising and sharing with third parties. If you agree with this use, click Allow All. To opt out, click Disable All. To allow some cookies and deny others, click Manage Preferences." Plaintiff Soleimanian also viewed Defendants' additional representation that users could "Disable All" cookies.

156. Plaintiff Soleimanian selected and clicked the “Disable All” cookies button. Plaintiff Soleimanian believed that selecting “Disable All” cookies on the popup cookie consent banner found on the Enfamil Website would allow her to opt out of, decline, and/or disable all cookies and other tracking technologies (inclusive of those cookies that cause the disclosure of tracking data to third-party advertising networks, analytics services, and/or social media companies for the purposes of providing personalized content, advertising, and analytics services).

157. In selecting the “Disable All” cookies button, Plaintiff Soleimanian gave Defendants notice that she did not consent to the use or placement of cookies and tracking technologies while browsing the Enfamil Website. Further, Plaintiff Soleimanian specifically rejected, based on Defendants’ representations, those cookies used for “personalized advertising and sharing with third parties.” In reliance on these representations and promises, only then did Plaintiff Soleimanian continue browsing the Enfamil Website.

158. Even before the popup cookie consent banner appeared on the screen, Defendants nonetheless caused cookies and tracking technologies, including those used for personalized content, advertising, analytics, and social media, to be placed on Plaintiff Soleimanian’s device and/or transmitted to the Third Parties along with user data, without Plaintiff Soleimanian’s knowledge. Accordingly, the popup cookie consent banner’s representation to Plaintiff Soleimanian that she could disable the use and/or placement of all cookies and tracking technologies while she browsed the Enfamil Website was false. Contrary to what Defendants made Plaintiff Soleimanian believe, she did not have a choice about whether third-party cookies would be placed on her device and/or transmitted to the Third Parties along with her user data; rather, Defendants had already caused that to happen.

159. Then, as Plaintiff Soleimanian continued to browse the Enfamil Website in reliance on the promises Defendants made in the cookie consent banner, and despite Plaintiff Soleimanian’s clear rejection of the use and/or placement of such cookies and tracking technologies, Defendants nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing personalized content,

advertising, analytics, and social media content from the Third Parties on her device. In doing so, Defendants permitted the Third Parties to track and collect Plaintiff Soleimanian's Private Communications as Plaintiff browsed the Enfamil Website. As illustrated in the screenshot in paragraph 41 and further explained in paragraphs 42–106, her Private Communications—including the products and product categories she viewed or selected and the search terms she entered—were intercepted, collected, and used by Third Parties such as Facebook, Google, TikTok, and Snapchat.

160. Defendants' representations that consumers could "Disable All" cookies while Plaintiff Soleimanian and users browsed the Websites, or at least those involved in providing personalized content, advertising, and social media services, were untrue. Had Plaintiff Soleimanian known this fact, she would not have used the Enfamil Website. Moreover, Plaintiff Soleimanian reviewed the popup cookie consent banner prior to using the Enfamil Website. Had Defendants disclosed that they would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to disable all cookies, Plaintiff Soleimanian would have noticed it and would not have used the Enfamil Website or, at a minimum, she would have interacted with the Enfamil Website differently.

161. Plaintiff Soleimanian continues to desire to browse content featured on the Enfamil Website. Plaintiff Soleimanian would like to browse websites that do not misrepresent that users can disable all cookies and tracking technologies. If the Enfamil Website were programmed to honor users' requests to reject all cookies and tracking technologies, Plaintiff Soleimanian would likely browse the Enfamil Website (and the other Websites) again in the future, but will not do so until then. Plaintiff Soleimanian regularly visits websites that feature content similar to that of the Websites. Because Plaintiff Soleimanian does not know how the Websites are programmed, which can change over time, and because she does not have the technical knowledge necessary to test whether the Websites honor users' requests to disable all cookies and tracking technologies, Plaintiff Soleimanian will be unable to rely on Defendants' representations when browsing the Websites in the future absent an injunction that prohibits Defendants from making misrepresentations on the Websites. The only way to determine what

network traffic is sent to third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Soleimanian is not a software developer and has not received training with respect to HTTP network calls.

162. The delayed discovery rule applies to Plaintiff Soleimanian's claims because, at the time of her visits to the Enfamil Website, she was unaware that even though she declined all cookies on the Enfamil Website, Defendants caused cookies, including the Third Parties' cookies, to be sent to her browsers, stored on her devices, and intercepted by the Third Parties along with her private user data. Nothing about Plaintiff's experiences on the Enfamil Website would have alerted a reasonable user that her selections were not being honored because the privacy violations occurred through hidden, technical processes not visible to ordinary users. Plaintiff Soleimanian lacked the technical expertise and specialized tools necessary to determine whether the Websites honored her opt-out selections or instead continued transmitting her data notwithstanding her selections, and she did not discover Defendant's conduct until a later investigation revealed it. Plaintiff Soleimanian first learned about the Enfamil Website's privacy violations from her counsel in or around July 2026.

## CLASS ALLEGATIONS

163. Plaintiffs bring this Class Action Complaint on behalf of themselves and a proposed class of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

> **Class**: All persons who browsed any of the Websites in the State of California after clicking the "Disable All" button in the popup cookies consent banner, or who otherwise disabled cookies through the "Manage Preferences" link in the popup cookies consent banner.

164. This action has been brought and may properly be maintained as a class action against Defendants because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

165. **Numerosity:** Plaintiffs do not know the exact size of the Class, but they estimate that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

166. **Common Questions Predominate:** This action involves common questions of law and fact to the Class because each class member's claim derives from the same unlawful conduct that led them to believe that Defendants would not cause third-party cookies to be placed on their browsers and devices and/or intercepted by third parties along with user data, after Class members chose to disable all cookies and tracking technologies on the Websites, nor would Defendants permit third parties to track and collect Class members' Private Communications as Class members browsed the Websites.

167. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a. Whether Defendants' actions violate California laws invoked herein; and

b. Whether Plaintiffs and Class members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

168. **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class because, among other things, Plaintiffs, like the other Class members, visited the Websites, disabled all cookies, and had their confidential Private Communications intercepted by the Third Parties.

169. **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of all Class members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to [them] for the unfair and illegal conduct of which they

complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the Class. By prevailing on their claims, Plaintiffs will establish Defendants' liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class members.

170. **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### First Cause of Action: Invasion of Privacy
### (asserted by all Plaintiffs against Defendant Reckitt for all Websites and asserted by Plaintiffs Barrales and Soleimanian against Defendant Mead Johnson for the Enfamil Website)

171. Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

172. To plead an invasion of privacy claim, Plaintiffs must show an invasion of (i) a legally protected privacy interest; (ii) where Plaintiffs had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendants constituting a serious invasion of privacy.

173. Defendants intruded upon the following legally protected privacy interests of Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiff's and Class members' Fourth Amendment right to privacy.

174. Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as Defendants affirmatively promised users they could "Disable All" cookies and tracking technologies before proceeding to browse the Websites. Plaintiffs and other Class members directed their electronic devices to access the Websites and, when presented with the popup cookies consent banner on the Websites, Plaintiffs and Class members clicked the "Disable All" cookies button or disabled such cookies through the "Manage Preferences" link and reasonably expected that their disabling of cookies and tracking technologies would be honored. That is, they reasonably believed that Defendants would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Websites. Plaintiffs and Class members also reasonably expected that, if they disabled such cookies and/or tracking technologies, Defendants would not permit the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Websites.

175. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

176. Defendants, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy and without their consent, permitted the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California. The data that Defendants allowed third parties to collect enables the Third Parties to (and they in fact do), *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiffs' and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

177. Defendants' actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

178. Defendants' intrusion into Plaintiffs' privacy was also highly offensive to a reasonable person.

179. Defendants lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track, intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

180. Plaintiffs and Class members have been damaged by Defendants' invasion of their privacy and are entitled to just compensation, including monetary damages.

181. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendants as a result of their intrusions upon Plaintiffs' and Class members' privacy.

182. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' disabling of the Websites' use of cookies. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

**Second Cause of Action: Intrusion Upon Seclusion**
**(asserted by all Plaintiffs against Defendant Reckitt for all Websites; and asserted by Barrales and Plaintiff Soleimanian against Defendant Mead Johnson for the Enfamil Website)**

183. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

184. To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendants intentionally intruded into a place, conversation, or matter as to which Plaintiffs had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

185. By permitting third-party cookies to be stored on consumers' devices without consent, which caused the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendants' representations otherwise in the popup cookie consent banner, Defendants intentionally intruded upon the solitude or seclusion of Website users. Defendants effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

186. The Third Parties' tracking and collecting of Plaintiffs' and Class member's Private Communications on the Websites using third-party cookies that Defendants caused to be stored on users' devices—and to be intercepted by the Third Parties—was not authorized by Plaintiffs and Class members, and, in fact, those Website users specifically chose to disable all such cookies.

187. Plaintiffs and the Class members had an objectively reasonable expectation of privacy surrounding their and their Private Communications on the Websites based on Defendants' promise that users could "Disable All" cookies, as well as state criminal and civil laws designed to protect individual privacy.

188. Defendants' intentional intrusion into Plaintiffs' and other users' Private Communications would be highly offensive to a reasonable person given that Defendants represented that Website users could "Disable All" cookies when, in fact, Defendants caused such third-party cookies to be stored on consumers' devices and browsers, and to be intercepted by third parties, even when consumers disabled all such cookies. Indeed, Plaintiffs and Class members reasonably expected, based on Defendants' false representations, that when they disabled all cookies and tracking technologies, Defendants would not cause such third-party cookies to be stored on their devices or permit the Third Parties to obtain their Private Communications on the Websites, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

189. Defendants' conduct was intentional and intruded on Plaintiffs' and users' Private Communications on the Websites.

190. Plaintiffs and Class members have been damaged by Defendants' invasion of their privacy and are entitled to just compensation, including monetary damages.

191. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well

as disgorgement of profits made by Defendants as a result of their intrusions upon Plaintiffs' and Class members' privacy.

192. Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' disabling of the Websites' use of cookies. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

**Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631)**

**(asserted by Plaintiff Penning and Plaintiff Soleimanian against Defendant Reckitt for all Websites; and asserted by Plaintiff Soleimanian against Defendant Mead Johnson for the Enfamil Website)**

193. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

194. California Penal Code § 631(a) provides, in pertinent part:

> "Any person [i] who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or [ii] [who] in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [iii] who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or [iv] who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

195. The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line permits an outsider to tap his telephone or listen in on the call." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

196. Further, as the California Supreme Court has held, in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*

> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication— the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360–61 (emphasis supplied; internal citations omitted).

197. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192–93 (1978). Thus, to establish liability under § 631(a), Plaintiffs need only establish that Defendant, "by means of any machine, instrument, contrivance, or in any other manner," did ***any*** of the following:

> [i] Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system;
>
> [ii] Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state;
>
> [iii] Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained

Cal. Penal Code § 631(a).

198. CIPA § 631(a) also penalizes those who [iv] "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

199. Defendants are "persons" within the meaning of California Penal Code § 631.

200. Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

201. The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

202. Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiffs and Class members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

203. Under § 631(a), Defendants must show they had the consent of all parties to a communication.

204. The Websites caused Plaintiffs and Class members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiffs' and Class members' consent. By configuring the Websites in this manner, Defendants willfully aided, agreed with, employed, permitted, or otherwise caused the Third Parties to wiretap Plaintiffs and Class members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

205. By their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class members, on the one hand, and Defendants, on the other, while the electronic

communications were in transit or were being sent from or received at any place within California.

206. The Private Communications of Plaintiffs and Class members, on the one hand, and Defendants, on the other, that the Third Parties automatically intercepted directly communicated the Website user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

207. The Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

208. Plaintiffs and Class members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class members' electronic communications. Nor did Plaintiffs and Class members provide their prior consent to Defendants aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiffs and Class members expressly declined to allow the Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic communications by choosing to disable cookies on the Websites.

209. The wiretapping of Plaintiffs and Class members occurred in California, where Plaintiffs and Class members accessed the Websites and where the Third Parties—as caused by Defendants—routed Plaintiffs' and Class members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiffs' California-located devices. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's

disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

210. Plaintiffs and Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of their right to privacy, (ii) loss of value in their Private Communications, (iii) damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties with no consent.

211. Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendants' violations of CIPA § 631(a), as well as injunctive relief.

212. Unless enjoined, Defendants will continue to commit the illegal acts alleged herein including, but not limited to, permitting third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendants. Plaintiffs, Class members, and the general public continue to be at risk because Plaintiffs, Class members, and the general public frequently use the internet to search for information and content related to consumer goods products, such as those marketed and sold by Defendants. Plaintiffs, Class members, and the general public continue to desire to use the internet for that purpose. Plaintiffs, Class members, and the general public have no practical way to know if their request to disable all cookies and tracking technologies will be honored and/or whether Defendants will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendants. Further, Defendants have already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' electronic Private Communications with Defendants and can continue to do so unless and until enjoined.

**Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51)**

**(asserted by Plaintiff Penning and Plaintiff Soleimanian against Defendant Reckitt for all Websites; and asserted by Plaintiff Soleimanian against Defendant Mead Johnson for the Enfamil Website)**

213. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

214. The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

215. California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

216. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

217. The Third Parties' cookies and the corresponding software code installed by Defendants on the Websites are each "pen registers" because they are "device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiffs' and the Class's computers or devices. Cal. Penal Code § 638.50(b).

218. At all relevant times, Defendants caused the Third Parties' cookies and the corresponding software code—which are pen registers—to be placed on Plaintiffs' and Class members' browsers and devices, and/or to be used to transmit Plaintiffs' and Class members' IP address and user-agent information. *See Greenley v. Kochava,* 2023 WL 4833466, at *15–16

(S.D. Cal. July 27, 2023); *Shah v. Fandom, Inc.*, 2024 U.S. Dist. LEXIS 193032, at *5–11 (N.D. Cal. Oct. 21, 2024).

219. Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiffs' and the Class members' electronic communications with the Websites. *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1008 (9th Cir. 2014) ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up).

220. Plaintiffs and Class members did not provide their prior consent to Defendants' use of third-party cookies and the corresponding software. On the contrary, Plaintiffs and the Class members informed Defendants that they did not consent to the Websites' use of third-party cookies by clicking the "Disable All" cookies button or disabling such cookies through the "Manage Preferences" link in the cookie consent banner.

221. Defendants did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiffs' and Class member's IP addresses and user-agent information.

222. As a direct and proximate result of Defendants' conduct, Plaintiffs and Class members suffered losses and were damaged in an amount to be determined at trial.

223. Pursuant to Penal Code § 637.2(a)(1), Plaintiffs and Class members are also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

**Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation**

**(asserted by all Plaintiffs against Defendant Reckitt for all Websites; and asserted by Plaintiffs Barrales and Soleimanian against Defendant Mead Johnson for the Enfamil Website)**

224. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

225. Defendants fraudulently and deceptively informed Plaintiffs and Class members that they could "Disable All" cookies.

226. However, despite Defendants' representations otherwise, Defendants caused third-party cookies and software code to be stored on consumers' devices, and to be intercepted by the Third Parties alongside Private Communications, even after users clicked the "Disable All" cookies button or disabled such cookies through the "Manage Preferences" link in the popup cookie consent banner. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' Private Communications, even when consumers had previously chosen to "Disable All" cookies.

227. These misrepresentations and omissions were known exclusively to, and actively concealed by Defendants, not reasonably known to Plaintiffs and Class members, and material at the time they were made. Defendants knew, or should have known, how the Websites functioned, including the Third Party's resources it installed on the Websites and the third-party cookies in use on the Websites, through testing the Websites, evaluating their performance metrics by means of their accounts with the Third Parties, or otherwise, and knew, or should have known, that the Websites' programming allowed the third-party cookies to be placed on users'—including Plaintiffs'—browsers and devices and/or intercepted by the Third Parties along with users' Private Communications even after users attempted to "Disable All" cookies, which Defendant promised their users they could do. Defendants' misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs and Class members as to whether to use the Websites. In misleading Plaintiffs and Class members and not so informing them, Defendants breached their duty to Plaintiffs and Class members. Defendants also gained financially from, and as a result of, their breaches.

228. Plaintiffs and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions.

229. Plaintiffs and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendants' unfair, deceptive, and/or unlawful practices, including the unauthorized interception of their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session

information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiffs and Class members have also suffered harm in the form of diminution of the value of their private and personally identifiable information and communications.

230. Defendants' actions caused damage to and loss of Plaintiffs' and Class members' property rights to control the dissemination and use of their personal information and communications.

231. Defendants' representations that consumers could "Disable All" cookies if they clicked the "Disable All" cookies button or disabled such cookies through the "Manage Preferences" link were untrue. Again, had Plaintiffs and Class members known these facts, they would not have used the Websites. Moreover, Plaintiffs and Class members reviewed the popup cookie consent banner prior to their interactions with the Websites. Had Defendants disclosed that they caused third-party cookies to be stored on Website visitors' devices that are related to personalization, advertising, analytics, and social media and/or share information with third parties even after they choose to disable all such cookies, Plaintiffs and Class members would have noticed it and would not have interacted with the Websites.

232. By and through such fraud, deceit, misrepresentations and/or omissions, Defendants intended to induce Plaintiffs and Class members to alter their positions to their detriment. Specifically, Defendants fraudulently and deceptively induced Plaintiffs and Class members to, without limitation, use the Websites under the mistaken belief that Defendants would not permit third parties to obtain users' Private Communications when consumers chose to disable all cookies. As a result, Plaintiffs and the Class provided more personal data than they would have otherwise.

233. Plaintiffs and Class members justifiably and reasonably relied on Defendants' misrepresentations and omissions, and, accordingly, were damaged by Defendants' conduct.

234. As a direct and proximate result of Defendants' misrepresentations and/or omissions, Plaintiffs and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

235. Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' disabling of the Website's use of cookies. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

**Sixth Cause of Action: Unjust Enrichment**
**(asserted by all Plaintiffs against Defendant Reckitt for all Websites and asserted by Plaintiffs Barrales and Soleimanian against Defendant Mead Johnson for the Enfamil Website)**

236. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

237. Defendants created and implemented a scheme to increase their own profits through a pervasive pattern of false statements and fraudulent omissions.

238. Defendants were unjustly enriched as a result of their wrongful conduct, including through their misrepresentation that users could "Disable All" cookies and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members disabled such cookies.

239. Plaintiffs and Class members' Private Communications conferred an economic benefit on Defendant.

240. Defendants have been unjustly enriched at the expense of Plaintiffs and Class members, and Defendant has unjustly retained the benefits of their unlawful and wrongful conduct.

241. Defendants appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendants at their detriment. These benefits were the expected result of Defendants acting in their pecuniary interest at the expense of Plaintiffs and Class members.

242. It would be unjust for Defendants to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

243. There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

244. Plaintiffs and Class members are entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the position they occupied prior to having their Private Communications tracked and collected by the Third Parties.

245. Plaintiffs plead this claim separately, as well as in the alternative, to their other claims, as without such claims Plaintiffs would have no adequate legal remedy.

## PRAYER FOR RELIEF

**WHEREFORE**, reserving all rights, Plaintiffs, on behalf of themselves and the Class members, respectfully request judgment against Defendants as follows:

A. Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B. An award of compensatory damages, including statutory damages where available, to Plaintiffs and Class members against Defendants for all damages sustained as a result of Defendants' wrongdoing, including both pre- and post-judgment interest thereon;

C. An award of punitive damages;

D. An award of nominal damages;

E. An order for full restitution;

F. An order requiring Defendants to disgorge revenues and profits wrongfully obtained;

G. An order temporarily and permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H. For reasonable attorneys' fees and the costs of suit incurred; and

I. For such further relief as may be just and proper.

Dated: September 23, 2026

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier*
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiffs*